**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**Civil Case Action No. 1:20-cv-813**

| | |
|---|---|
| SARAH SMITH, MICHAEL CRISCO, and JEFFREY MORROW, Individually and as representatives of a class of similarly situated persons, | |
| Plaintiffs, | |
| v. | **COMPLAINT -- CLASS ACTION** |
| SHOE SHOW, INC.; BOARD OF TRUSTEES OF SHOE SHOW RETIREMENT SAVINGS PLAN; JOHN VAN DER POEL, ROBERT TUCKER, LISA TUCKER, and SPENCER NORTHCUTT, | |
| Defendants. | |

1.      Federal law has afforded employers the privilege of enticing and retaining employees by setting up retirement and defined contribution plans pursuant to 26 USC § 401 ("401(k) plans").  These plans provide employees investment options with tax benefits that inure to the benefits of the employees and, necessarily, to the employers by increasing the "net" compensation their employees receive via tax deferment.  To enjoy this benefit, employers must follow the rules and standards proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et. seq.* ("ERISA").  Shoe Show, Inc. ("Shoe Show") chose to accept the benefits of federal and state tax deferrals for their employees via a 401(k) plan, and the owners and executives of Shoe Show have benefitted

financially for years from the same tax benefits. However, Shoe Show has not followed ERISA's standards of care. This lawsuit is filed after careful consultation with experts and publicly available documents to return benefits taken from Shoe Show's employees by Shoe Shoe's owners, executives and 401(k) vendors. Although ERISA has a reputation for being notoriously complicated, at its core the issue is simple: Shoe Show did not act reasonably and consistent with ERISA, costing Shoe Show's employees millions of dollars, by: (1) allowing MassMutual to charge participants excessive fees, (2) loading the Plan with high cost funds when identical lower cost equivalents were available, and (3) not diversifying the Plan's investments.

2. Plaintiffs Sarah Smith, Michael Crisco, and Jeffrey Morrow, individually and as a representative of a class of similarly situations persons, and on behalf of the Shoe Show, Inc. Retirement Savings Plan or Shoe Show Retirement Savings Plan (on Form 5500 the defendants seem to use both names, together, the "Plan"), bring this class action against the Plan's fiduciaries.

| Part II | Basic Plan Information—enter all requested information | | |
|---|---|---|---|
| **1a** Name of plan<br>SHOE SHOW RETIREMENT SAVINGS PLAN | | **1b** Three-digit plan<br>number (PN) ▶ | 001 |
| | | **1c** Effective date of plan<br>01/01/1989 | |
| **2a** Plan sponsor's name (employer, if for a single-employer plan)<br>Mailing address (include room, apt., suite no. and street, or P.O. Box)<br>City or town, state or province, country, and ZIP or foreign postal code (if foreign, see instructions)<br>SHOE SHOW, INC.<br><br>2201 TRINITY CHURCH ROAD<br>CONCORD, NC 28027 | | **2b** Employer Identification<br>Number (EIN) | |
| | | **2c** Plan Sponsor's telephone<br>number<br>704-782-4143 | |
| | | **2d** Business code (see<br>instructions)<br>448210 | |

Caution: A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, as well as the electronic version of this return/report, and to the best of my knowledge and belief, it is true, correct, and complete.

| SIGN<br>HERE | Filed with authorized/valid electronic signature.<br>**Signature of plan administrator** | 10/10/2019<br>Date | JOHN VAN DER POEL<br>Enter name of individual signing as plan administrator |
|---|---|---|---|
| SIGN<br>HERE | Filed with authorized/valid electronic signature.<br>**Signature of employer/plan sponsor** | 10/10/2019<br>Date | JOHN VAN DER POEL<br>Enter name of individual signing as employer or plan sponsor |

2

3.     Defendants are Show Show, Inc., the Board of Trustees of Shoe Show Retirement Savings Plan, John Van Der Poel, Robert Tucker, Lisa Tucker, Spencer Northcutt.

4.      Defendants made imprudent decisions in the management of its ERISA sponsored retirement plan based on information obtained by Plaintiffs' counsel from the Defendants' Forms 5500 "Annual Report of Employee Benefit Plan" sent to the U.S. Treasury and U.S. Department of Labor.

### JURISDICTION AND VENUE

5.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the Plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain appropriate equitable and monetary relief as set forth in 29 U.S.C. § 1109.

6.     This case presents a federal question and, therefore, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

7.      Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

8.     Although some ERISA claims for denial of benefits require claimants to exhaust administrative remedies, no such requirement applies to breaches of fiduciary duty. As such, this Court has jurisdiction of this case without plaintiffs having to show that they have exhausted remedies.

3

9.     The Class Period is the six years prior to the date of the filing of this Complaint.

## THE PARTIES
### Plaintiffs

10.     Plaintiff Sarah Smith is a citizen and resident of Cabarrus County, North Carolina.  During her employment, she participated in the Plan and invested for her retirement in the Plan.

11.     Plaintiff Michael Crisco is a citizen and resident of Cabarrus County, North Carolina.  During his employment, he participated in the Plan and invested for his retirement in the Plan.

12.     Plaintiff Jeffrey Morrow is a citizen and resident of Cabarrus County, North Carolina.  During his employment, he participated in the Plan and invested for his retirement in the Plan.

13.     Each plaintiff has standing to bring this action because each of them participated in the Plan during the class period and was injured by Defendants' unlawful conduct and failure to have adequate processes to provide a prudent plan.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty.

### The Plan

14.     Shoe Show is the "plan sponsor" of the Plan within the meaning of 29 U.S.C. § 1002(16)(B).

4

15.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

16.     The Plan is a tax-qualified plan under 26 U.S.C. § 401, and thus is a qualified 401(k) profit sharing plan.

17.     The Plan was established on January 1, 1989.

18.     The Plan covers eligible employees and former employees of Shoe Show.

19.     Shoe Show acted as the Plan's sponsor and trustee throughout the applicable class period.

20.     On the Form 5500s filed by Defendants, the Plan administrator is identified as the same name and address as the Plan's sponsor, to wit, Shoe Show.

**Defendants**

21.     Shoe Show is an American footwear retailer based in Concord, North Carolina. It operates over 1,100 shoe stores throughout the United States across 47 states under the brands Shoe Show, The Shoe Dept., The Shoe Dept. Encore, Shoebilee!, Burlington Shoes, and Shoe Show Mega.

22.     Defendant Mr. Robert Tucker founded Shoe Show in 1965 and is an officer of Shoe Show. Upon information and belief, he is on the Board of Trustees.

23.     Defendant Ms. Lisa Tucker who, upon information and belief serves as the President of Shoe Show.  Upon informiton and belief, she is on the Board of Trustees.

24.     Defendant Mr. John Van Der Poel who, upon information and belief, serves as the Chief Financial Officer of Shoe Show. He is also the Plan's administrator according to publicly-available documents, including, inter alia, the December 31, 2018 Financial Report on file with the Department of Labor.

25.     That same December 31, 2018 Financial Report avers that the Plan Administrator (Ven Der Poel) and "The Board of Trustees" … "determine the appropriateness of the Plan's investment offering and monitor investment performance." As such, the Board of Trustees is a proper defendant.

26.     Defendant Mr. Northcutt acts as the financial general manager of Shoe Show. Upon information and belief he is on the Board of Trustees.

27.     Shoe Show is the sponsor of the Plan. Under the Plan's operative documents Shoe Show is responsible "for the general administration and interpretation of the Plan" at all times during the class period.

28.     During the class period, MassMutual served as the Plan's recordkeeper. LPL also worked, in 201 and before, as an investment advisor to the Plan. The Plan has also hired TPAs to work for the Plan, including recently Blue Sky 401(k) Specialists, Inc. ("Blue Sky").

29.     Shoe Show retains control over its employees, Board, departments, agents, and vendors who perform fiduciary functions in response to the Plan, including the power to appoint or terminate, determine levels of compensation and vendors. Shoe Show has

6

the same power with regard to the aforementioned Board of Trustees. Shoe Show is thus liable for these individuals' and entities' actions via respondeat superior.

## DEFINTIONS AND CITATIONS

30.     The following section will explain the relevant working terminology, definitions, and statutory provisions applicable to this Complaint. Unfortunately, there will be a necessity for some repetition and overlap, but the undersigned has attempted to make this section helpful to the Court to the extent the parties can have an understanding of a working vocabulary going forward.

### 1.     FIDUCIARY / PRUDENCE GENERALLY

31.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a)(1) states, in relevant part, that: a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

> (A)     for the exclusive purpose of:
>
> > (i)     providing benefits to participants and their beneficiaries; and
> >
> > (ii)     defraying reasonable expenses of administering the plan;
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

7

(C)     by diversifying the investments of the plan so as to minimize the risk

of large losses, unless under the circumstances it is clearly prudent not to do

so; and

(D)     in accordance with the documents and instruments governing the plan

insofar as such documents and instruments are consistent with the provisions

of this subchapter and subchapter III.

32.     ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other fiduciaries of the Plan. 29 U.S.C. § 1104(a)(1). These fiduciary duties are "the highest known to the law." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014) (citation and quotation marks omitted). Fiduciaries must act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).

33.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000).

34.     The Supreme Court has noted that the legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). Therefore "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.* In fact, the duty of prudence imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law. *Buccino v. Continental Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983).

8

## 2. CO-FIDUCIARY

35. ERISA recognizes co-fiduciaries and related liability. U.S.C. § 1105(a) states, in pertinent part, that:

> (A)  In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (i)  If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
> >
> > (ii)  if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (iii)  If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## 3. FIDUCIARY DUTIES / PRUDENCE REGARDING INVESTMENTS

36. ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). The prudent person

9

standard in ERISA requires "a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments" within a "reasonable time". *Tibble*, 135 S. Ct. at 1828.

37.     Fiduciaries are obligated to assemble a diversified menu of investment options. 29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii). Each investment option is generally a pooled investment product—which includes mutual funds, collective investment trusts, and separate accounts—offering exposure to a particular asset class or sub-asset class. The relevant MassMutual investment policy states:

> The Plan intends to provide an appropriate range of investment options that will span the risk/return spectrum and allow Plan participants to construct portfolios consistent with their unique individual circumstances, goals, time horizons and tolerance for risk. Major asset classes to be offered may include: Stable Value, Fixed Income (multiple categories), Asset Allocation (lifestyle and balanced), Asset Allocation (lifecycle), Large Cap Equity (multiple styles), Multi Cap Equity (multiple styles), Mid Cap Equity (multiple styles), Small Cap Equity (multiple styles), International/Global (multiple styles and categories), Specialty (sector and other narrowly defined options) and Self-Directed Brokerage Account.

### 4.  FIDUCIARY DUTIES / PRUDENCE REGARDING FEES, COSTS AND EXPENSES AND PROHIBITED TRANSACTIONS

38.     Pursuant to the **prudent investor rule**, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007); *see also* Restatement

§ 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function."). The Introductory Note to the Restatement's chapter on trust investment further clarifies:

> (A)     [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule. This is done to reflect the importance of market-efficiency concepts and differences in the degrees of efficiency and inefficiency in various markets. . . . The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled investment vehicles. In addition, active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies. Restatement (Third) of Trusts ch. 17, intro. note (2007). Where markets are efficient, fiduciaries are encouraged to use low-cost index funds. *Id.* § 90 cmt. h(1). While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "[a]ctive strategies . . . entail investigation and analysis expenses and tend to increase general transaction costs . . . . [T]hese added costs . . . must be justified by realistically evaluated return expectations." *Id.* § 90 cmt. h(2).

39.     As such, a prudent investor may not select higher cost investments when lower costs are available.

11

40.     There are two major categories of expenses within a defined contribution plan: investment management expenses and administrative expenses.

41.     **Investment management expenses** are asset-based fees that are charged by a mutual fund to compensate the investment manager and fund company for managing the assets of the fund and are a common and equivalent component among all share classes within a fund's expense ratio.

42.     **Administrative expenses** are the expenses a plan incurs for administration services such as recordkeeping, accounting, legal and trustee services. These fees can be paid out of the Plan's investments or directly by the Plan's participants or plan sponsor.

43.     **Expense ratio** is the annual operating expenses of a plan reflected as a percentage of the plan's assets and includes any SEC Rule 12b-1 fees, and other forms of revenue sharing, etc, in addition to investment management fees. These fees are directly deducted from the mutual fund's returns. On average, 82% of overall fees within a plan are investment expenses as expressed by the expense ratio, while administrative fees on average make up only an average of 18% of total fees.

44.     **12b-1 fees** are a component of the expense ratio charged to participants to pay providers such as brokers/advisors for the marketing and distribution of a fund and may be used to pay other plan service providers. This fee is unique to each share class and can range from 0.00% to 1.00%.

45.     **Sub-transfer agency (Sub-T/A) fees** are a payment to a third party administrator (TPA) or recordkeeper who holds an omnibus account at the mutual fund

company for maintaining records of a plan's individual participants. Similar to 12b-1 fees, this fee is unique and specific to each share class.

46. **Omnibus account** refers to the account designated to hold the securities and assets of a Plan for the benefit of the participants. Plan participants are trust beneficiaries but the securities are registered to the trust and not individually or in their name. Securities are traded daily and values sent to the recordkeeper to update participants' accounts and websites.

47. A **recordkeeper** maintains software to hold accounting records to match the omnibus trust assets. The recordkeeper performs "daily valuations" in their accounting software to reflect the allocations of earnings of the trust assets for which each worker is entitled. It is essentially the 401k plans' bookkeeper. The recordkeeper tracks who is in the plan, what they own, and what money is going in and out.

48. The recordkeeper acts as the heart and soul of the plan making sure that the money and information goes where it is supposed to go. The recordkeeper typically provides information and a website about the investments. However, the recordkeeper is not necessarily a fiduciary. Rather, the fiduciary duties are typically relegated to the employer. In this case, the fiduciaries are the Defendants who are herein named.

49. **Recordkeeping expenses** are typically the largest administrative expense, followed by custodial/trustee services. Records of participants are held so that aggregate trust actions at an omnibus level can be accounted for each business evening.

50. A **custodian** is responsible for holding an omnibus account of the Plan's

13

assets, to facilitate the paying of plan providers from the investments, and safekeeping assets.  It is analogous to a bank.  A custodian does not provide investment advice.

51.    Recordkeeping and custodial services are essentially commodities. Eric Droblyen, *Evaluating 401k Providers: Separating Commodity from Value-Added Services*, The Frugal Fiduciary Blog (Feb. 10, 2015), so fiduciaries should, therefore, select recordkeeping and custodial service providers based upon which provider can provide these services at the lowest cost to the Plan.

52.    A Plan can periodically engage in a competitive bidding process by submitting a Request for Proposal (RFP) to multiple service providers. According to the Department of Labor ("DOL"), regular use of each of these tools is the best means of controlling plan costs. Dep't of Labor Employee Benefits Security Administration, *Understanding Retirement Plan Fees and Expenses*, at 11 (December 2011), http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf; Chao, Philip, "Whack-a-Mole," Catch Me if You Can Fiduciary Considerations in Controlling and Accounting for Administrative Fees, Jan. 25. 2014, at 16, http://www.experientialwealth.com/Data/Files/Whack-A-Mole%20-%20Fiduciary%20Considerations%20in%20Plan%20Fees%202014%2001%2025%20Chao%20Co%20S.pdf.

53.    **Asset-based compensation** occurs when a broker, recordkeeper or custodian is paid as a percentage of plan assets. This pay is thus a percentage of assets, and the assets consist of 1) salary that employees have put into the Plan, 2) employer matching dollars to

14

the trust, 3) interest and dividends the trust earns on securities, and 4) realized and unrealized capital gains on trust investments. This method of payment virtually guarantees pay increases to providers when employees save each pay period without regard to increases in labor required by or liability exposure to those providers.

54. **Fixed dollar** or **per head compensation** occurs when a recordkeeper or custodian is paid a certain, set amount per participant without regard to 1) the amount each participant saved to the plan, 2) the amount the Plan and trust earns, and 3) the amount the employer deposited to the Plan and trust.

55. Administrative expenses can be paid directly by employers, directly by the plan, or indirectly as a built-in component of the fees charged for the investment products offered in the plan in a practice known as "**revenue sharing**." Ayres & Curtis, *Beyond Diversification* at 1486; ICI/Deloitte Study at 16.

56. Fees paid directly to service providers out of the plan assets are referred to as "Direct Compensation"; monies received by service providers pursuant to a revenue-sharing scheme are referred to as "Indirect Compensation." 29 C.F.R. § 2550.408b-2(c)(viii)(B); IRS Form 5500, Schedule C.

57. Eric Droblyen, July 24th, 2019, in *Revenue Sharing - 5 Reasons for 401(k) Fiduciaries to Avoid it* https://www.employeefiduciary.com/blog/avoid-revenue-sharing states: "Following a groundswell in excessive 401(k) fee litigation over the past decade, employers are demanding more transparent and fair provider fees to help them stay out of trouble. This trend has led to a decline in the use of revenue sharing." Additionally he says:

(A)     Revenue sharing limits investment options

(B)     Revenue sharing is often unfair

(C)     Revenue sharing can outstretch service level

58.     Fees or compensation to Plan service providers can become excessive when they are NOT based on 1) labor and material costs plus 2) a reasonable profit.

59.     Plans that allow providers/vendors to enjoy revenue sharing pay those providers asset based compensation, not fixed dollar or per head pay.

60.     If providers are paid based on revenue sharing, over time as assets rise in value services provider by the provider must increase commensurately or a violation of ERISA Section 408(b)(2) occurs creating an IRS and Labor Department prohibited transaction for every year of overpayment.

61.     Most, but not all, forms of direct and indirect compensation are certified and filed annually by the Defendants on the Plan's Annual Report or **Form 5500**—the form that must be filed for employee benefit plans under sections 104 and 4065 of ERISA—or in the audited financial statements of ERISA-compliant 401(k) plans.

62.     Fiduciaries **should use a competitive bidding process, such as a request for proposal, to select a new recordkeeper**. And, fiduciaries must monitor recordkeeping costs and services at reasonable intervals, such as every year or two. The key is that the fiduciary examination reflects the current circumstances, e.g., changes in market pricing, the size of the plan as it grows, the number of covered participants and technological efficiencies garnered by recordkeepers.  Cost savings from technoligcal efficiencies and

16

innovation have allowed recoverkeepers to decrease their participant fees by fifty percent since 2006.

63. The plan sponsor must monitor the Plans' recordkeeping costs according to the duties of prudence, loyalty and the Plan documents.

64. The plan sponsor must regularly leverage the plan size and negotiate for lower costs. An ERISA budget account is a commonly used way for plan sponsors to capture all revenue sharing payments, when a plan makes the poor decision to allow revenue sharing. This account serves multiple functions: 1) plan sponsors can readily account for and monitor all revenue sharing payments, 2) ensures service providers negotiate for and receive only reasonable fees each year, and 3) excess payments can be credited back to participants.

65. Under trust law, plan sponsors must "avoid unjustified costs" and choose investments with the lowest expense ratios, particularly when the two investments are the same.

66. The general duties of loyalty and prudence imposed by 29 U.S.C. § 1104 are supplemented by 29 U.S.C. § 1106, which provides a detailed list of **prohibited transactions** that constitute *per se* violations of ERISA. 29 U.S.C. § 1106(a)(1), in pertinent part:

> (A)    A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

> (i)     sale or exchange, or leasing, of any property between the plan and a party in interest; . . .
>
> (ii)    furnishing of goods, services, or facilities between the plan and a party in interest;
>
> (iii)   transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

67.     29 U.S.C. § 1106(b) relates to transactions between the plan and a fiduciary of the plan, providing that:

68.     A fiduciary with respect to a plan shall not—

> (A)     deal with the assets of the plan in his own interest or for his own account;
>
> (B)     in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries; or
>
> (C)     receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

### 5.  ASSET CLASSES AND TYPES

69.     The broad asset classes generally include fixed investments, bonds, stocks, and real estate.

18

70. Money market funds, guaranteed investment contracts, and stable value funds are examples of **fixed investments**.

71. **Bonds** are debt securities, which are generally categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 month and 30 years), and the credit risk associated with the particular borrower.

72. **Equity**, or **stock**, investments, are generally defined by three characteristics: (1) where they invest geographically (i.e., whether they invest in domestic or international companies, or both); (2) the size of company they invest in (generally categorized as small cap, mid cap, or large cap); and (3) their investment style, i.e. growth, value, or blend.

73. **Target-date funds** assemble a broad portfolio of investments from different asset classes at a risk level that declines over time as the targeted retirement date approaches.

74. **Mutual funds** are investment funds governed by the U.S. Securities & Exchange Commission ("SEC") under the Investment Company Act of 1940.

75. **Index funds** are low-cost mutual funds that invest in a specified basket of underlying investments so as to match or track a specific broadly used market index such as the S&P 500. Index funds are also known as "passive" funds because there is no portfolio manager actively buying and selling securities in an attempt to opportunistically time the market. Passively managed index funds are referenced in The American Law Institute, 1992, Restatement of the Law Third, Trusts—Prudent Investor Rule: "The greater the

19

trustee's departure from one of the valid passive strategies, the greater is likely to be the burden of justification and also of continuous monitoring."

76.     By following the passive fund strategy, index funds produce returns that are very close to the market segment tracked by the index. *Id.*

77.     Index funds, therefore, offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses. *Id.*

78.     Because the Defendants only chose high cost actively managed funds, their burden is extremely high. The median, average and dollar-weighted average expense ratio of the funds in the Plan exceed 1% annually in all periods between 2009 and 2018.

79.     **Passive funds**, popularly known as "index funds," seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483, 493 (2013).

80.     **Actively managed funds**, on the other hand, use portfolio managers to pick individual stocks or bonds within a particular asset or sub-asset class to try to beat the market through superior investment selection. *Id.* at 485–86. S&P Dow Jones Scorecard writes "Over the long-term investment horizon, such as 10 or 15 years, 80% or more of active managers across all categories underperformed their respective benchmarks."

81.     Actively managed funds are typically much more expensive than index funds but offer the potential to outperform the market (although this potential is typically not realized).

Case 1:20-cv-00813-WO-JEP   Document 1   Filed 09/03/20   Page 20 of 65

82. Trust law imparts a higher burden on fiduciaries when selecting actively managed funds (whose average fees are about 1% per year) that utilize a portfolio manager to manage a median of 80 to 90 stocks in an effort to beat a particular index. The extra burden exists because fiduciaries are effectively betting with participant assets that a fund manager has the skill to outperform a significantly less expensive index. Since expected return of stocks and bonds is effectively 5% over time, this 1% charge equates to 20% of the participants' expected returns.

83. U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses*, at 9 (Dec. 2011), available at http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf.

84. **Loaded funds** refer to funds that charge SEC rule 12b-1 fees of over 0.25% per year.

85. **No-load funds** refer to funds that may contain a minimal SEC rule 12b-1 fee (no more than 0.25%), and no front or back-end loads.

## DEFINITION OF EXPENSES
## DEFINITION OF INSTITUTIONAL AND RETAIL FUNDS

86. **Share classes** are separate product units of a mutual fund portfolio created for different distribution methods and service levels. Each share class within a mutual fund portfolio is *identical* in every respect except for the net returns and the distribution and service costs, such as SEC rule 12b-1 fees and shareholder service fees. Because these costs are reflected in the net returns, the performance of each share class will be higher or lower solely based on these expenses: the higher the expenses, the lower the returns. Broadly speaking, share classes are broken into institutional and retail categories.

21

87.     An **institutional share class** is a "no-load" class of shares that is available to large investors. Typical institutional shares have higher minimum investment requirements but lower fees than their retail counterparts that are available to the general public where minimum required purchases range from $0 to $2,500.

88.     Institutional share classes are commonly known to have symbols such as "I" or "R6" at the end of their names. Reflected in Morningstar®: "You may be surprised to learn that many times, the institutional share class is the most widely held share class of a particular fund strategy. And, according to the Investment Company Institute, the "vast majority" of assets in institutional shares classes are held by retail investors." Regarding minimum required purchase amounts, these are typically waived on request. Morningstar® states: "Sometimes an advisor will bundle clients' accounts into a larger "omnibus account" to meet the higher minimum investment on lower-cost shares…"[1]

89.     A **retail share class** is a class of shares intended for individual investors with lower amounts to invest and higher service needs.

90.     Retail share classes commonly have front- or back-end loads and SEC rule 12b-1 and/or shareholder service fees of 0.25% or more.

91.     Retail share classes are commonly known to have symbols such as "A", "Adv" or "R1" through "R4" at the end of their names.

---

[1] https://www.morningstar.com/articles/823640/how-to-access-funds-with-high-minimum-investments

## SHOE SHOW'S CONDUCT

**Shoe Show Failed to control plan costs and expenses, breaching its fiduciary duty/prudence obligations regarding fees and costs**

92.     The duty of loyalty requires fiduciaries to act "solely in the interest" of plan participants and beneficiaries, and "for the exclusive purpose of providing benefits to participants" and "defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

93.     The Defendants, including Shoe Show and Plan administrator Jack Van Der Poel, allowed MassMutual and the mutual funds within the Plan to take millions of dollars from the Plan's participants. MassMutual received handsome compensation, much higher than what Shoe Show could have easily negotiated, which ultimately the Plan's participants, including the class representatives, paid. Additionally, the Defendants inexplicably limited the participants' selection to only the most expensive funds available, even when many lower cost share classes were available. The Defendants never required MassMutual to obtain lower cost funds (except for a small change in 2017, effective 2018, that will be discussed later) or put the Plan's recordkeeping contract up for bid to cause MassMutual to competitively bid for Shoe Show's work. Instead, Shoe Show continued, for the entire class period, to neglect its duties and allow MassMutual to get rich off its employees.

23

## A. DEFENDANTS ALLOWED MASSMUTUAL TO OVERCHARGE THE PLAN WITH EXCESSIVE RECORDKEEPING FEES AND EXCESSIVELY EXPENSIVE FUNDS

### MassMutual's Excessive Recordkeeping Fees

94.     The Defendants allowed excessive compensation to be paid to providers such as LPL and, primarily, MassMutual over the years.

95.     ERISA requires fiduciaries to defray reasonable expenses of administering a plan.  29 U.S.C. § 1104(a)(1)(A).

96.     MassMutual is the recordkeeper for the Plan.

97.     Based on 1) SEC-prospectus' for the Plan's invstements listed on the Plan's Form 5500 Schedule of Assets, certified and filed with the IRS and Labor Department at www.efast.dol.gov, and 2) Schedules A and C for each plan year, MassMutual has been paid an average 73 basis points (0.73%) annually for recordkeeping indirectly (other direct charges were indicated on the Defendants' publicly available Forms 5500), through asset based compensation over the class period (described more fully later).  The 0.73% equates to $219 per participant per year when, according to NEPC, the average recordkeeping cost was $60 per participant in 2019 ($64 in 2016 and $118 in 2006). NEPC is one of the industry's largest independent, full-service investment consulting firms, serving over 350 retainer clients with total assets over $1.1 trillion. NEPC's March 2020 report showed the average recordkeeping fees for a 401k plan is about $60 dollars per participant[2] per year

---

[2] https://www.nepc.com/insights/2019-dc-plan-and-fee-survey

24

with an average expense ratio of forty basis points (0.40%). Fifty three percent (53%) of plans used fixed dollar payment to recordkeepers like MassMutual.

98.     Defendants' certified Annual Reports found at www.efast.dol.gov for each filing in the ten year period from 2009 through 2018 indicate that Jack Van Der Poel electronically signed as both 1) "plan administrator" and 2) "employer/plan sponsor."

| | | | |
|---|---|---|---|
| **Caution: A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.** | | | |
| Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, as well as the electronic version of this return/report, and to the best of my knowledge and belief, it is true, correct, and complete. | | | |
| SIGN HERE | Filed with authorized/valid electronic signature. | 10/10/2019 | JOHN VAN DER POEL |
| | **Signature of plan administrator** | Date | Enter name of individual signing as plan administrator |
| SIGN HERE | Filed with authorized/valid electronic signature. | 10/10/2019 | JOHN VAN DER POEL |
| | **Signature of employer/plan sponsor** | Date | Enter name of individual signing as employer or plan sponsor |

99.     Information derived from these publicly available documents reveals that the 73 basis points (0.73%/annum) come from 50 basis points (0.50%) paid as 12b-1 fees, plus sub-transfer agency fees for each fund that average 23 additional basis points or 0.23%/annum.

100.    According to the Defendants' Forms 5500, the Plan grew nearly 150% over the past decade, Shoe Show never required MassMutual to take a reduced fee.

101.    MassMutual was paid its average recordkeeping fee of 73 basis points as a percentage of assets in the Plan.

102.    While MassMutual's rate remained relatively steady, because the assets grew, so did MassMutual's effective earnings even though its duties and accounting costs did not grow in proportion.

103.    In fact, MassMutual or Shoe Show appear to have added Miles & Associates as a TPA in 2015 and replaced them with Blue Sky in 2016.  Blue Sky is paid additional money and takes a burden away from MassMutual and Shoe Show.

104.    Because recordkeepers have continually lowered their costs due to efficiencies, technical improvements and competition, the Defendants should have, and easily could have, used the Plan's increasing size and long-standing relationship as bargaining power to reduce the participants' recordkeeping fee.

105.    Said differently, as workers placed more money into these higher costs yet lower performing investments, the Defendants allowed increases in the mutual fund asset-based compensation to "kickback" to MassMutual even though MassMutual did no additional work (committing prohibited transactions in violation of ERISA, 29 U.S.C. §1106).

106.    Shoe Show's 2014 Form 5500 reveals that the average account balance was $31,600, so causing MassMutual to be compensated based on a flat fee would have been much more prudent.   It is generally more prudent for an employer and sponsor such as Shoe Show, with a relatively large plan, to require recordkeeping to be charged as a flat fee per participant to avoid a windfall to the recordkeeper as a Plan grows. Shoe Show should have required MassMutual to charge a flat fee, such as $60 at the most, for each participant to reflect the actual cost of recordkeeping.   Had Shoe Show done this, MassMutual still could have made a reasonable profit, but not the windfall it made of the Plan participants.

107.    As far as using revenue sharing to pay recordkeeping costs, there is only one argument where this method of charging workers for recordkeeping cost is prudent. In a hypothetical startup 401k plan where the average worker has a very low account balance, likely $10,000 or less, it might be prudent to have the recordkeeper charge as a percentage of assets. That is not the case with Shoe Show's plan during the class period. Conversely, Shoe Show's participants' average account balance for years and years vastly exceeded that amount.

108.    Defendants had a duty under ERISA to monitor service providers, and any overpayment to providers must be restored to the Plan after the providers have earned a "reasonable profit." Otherwise, an IRS Code Section 4975 Prohibited Transaction occurs for each plan year causing the Defendants to be liable for excise taxes from both the IRS and Labor Department. As noted at the IRS' site entitled "Tax Consequences of Plan Disqualification" [3]: "When an Internal Revenue Code section 401(a) retirement plan is disqualified, the plan's trust loses its tax-exempt status and becomes a nonexempt trust. Plan disqualification affects three groups:

        (A)    Employees

        (B)    Employer

        (C)    The plan's trust"

---

[3] https://www.irs.gov/retirement-plans/tax-consequences-of-plan-disqualification#:~:text=When%20an%20Internal%20Revenue%20Code,and%20becomes%20a%20nonexempt%20trust.

27

109.    LPL Financial was involved with the Plan as an investment consultant until 2014.  Like MassMutual, LPL was also overly-generously compensated.  Based on the 2014 Form 5500, it appears that $87,043 (Exhibit 2, para 113 below) in SEC Rule 12b-1 fees were indirectly paid by MassMutual to LPL Financial LLC in 2014 under an inappropriate service code "24" (which is for "trustee" services).

| (a) Enter name and EIN or address (see instructions) | | | | | | | |
|---|---|---|---|---|---|---|---|
| LPL FINANCIAL LLC | | | | | | | |
| 95-2834236 | | | | | | | |
| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan.  If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
| 24 | NONE | 0 | Yes ☒  No ☐ | Yes ☒  No ☐ | 87043 | Yes ☐  No ☒ |

110.    LPL never serves as a plan trustee due to inherent conflicts at the broker dealer level. Instead, it typically assists in selecting and monitoring investments. Payments to LPL on the Defendants' 2012 and 2013 filings to the Labor Department and IRS also were coded incorrectly as "Trustee (discretionary)" (but paid $101,462 in 2012 and $108,739 in 2013).

111.    All that LPL would really have to do is select which funds are in the plan, and relatively simple paperwork and communications regarding that job.  If the broker at LPL in charge of the Shoe Show account had skills in the marketplace that justified about $200 per hour, and he was paid around $100,000 annually, that would mean that he would need to work about 500 hours to justify this fee.  In reality, his job selecting and monitoring Shoe Show investments is likely under 50 hours per year deserving a $10,000 maximum

28

fee assuming both LPL (the broker dealer) and the registered representative (broker) servicing the Plan were found to be "necessary for the operation of the Plan" under ERISA § 408(b)(2)'s prohibited transaction exemption rules. Given the list of funds in 2014 were both imprudent and virtually the same as those in the prior years when LPL and the broker were paid six-figures, the Plan, trust and participants were better off if LPL and its representative were never chosen by the Defendants as a provider.

112.    In conclusion, the Defendants including Shoe Show, Inc. and Van Der Poel allowed MassMutual and others, year after year, to unlawfully charge excessive fees to the Plan and trust that ultimately harmed the entire Class.

## MassMutual's Excessively Expensive Funds

### Part 1 – Defendants Provided Retail, not Institutional, Funds, Costing the Plan Millions

113.    Defendants had an obligation to "avoid unjustified costs" and obtain the cheapest funds possible, particularly where two or more funds were identical in all meaningful aspects.

114.    The Defendants should try to obtain institutional share classes as opposed to their retail equivalents. The *only* difference between retail and institutional funds is that the institutional funds are less expensive to the participants.

115.    There is no evidence that Defendants tried to get better funds for the Plan, at least until 2018. Quite the contrary, up until that point, the Defendants continually imprudently limited their participants' choices to high-cost retail share classes of funds. Even in 2018, the share class improvements were minimal and inconsistent. Based on the

Defendants' Forms 5500, Shoe Show's fiduciaries never asked MassMutual to reduce compensation (and of course, as a profit seeking non-fiduciary entity, MassMutual had no real incentive to recommend better institutional shares or a more participant-friendly pay structure).

116.    Defendants use consistently lower performing, most expensive retail, not institutional funds, causing increased fees to the participants as they strive to save more.

117.    Defendants lack a process to meaningfully evaluate funds in the Plan. Instead, defendants' only semblance of a process is to delegate its resposnibilities completely to other parties who do not have fiduciary responsibilities to select the best investments for the Plan's members and, in fact, have opposite incentives.

118.    Defendants upon information and belief did not even ask MassMutual for institutional funds.  Recordkeepers and mutual fund providers are willing, particularly given the size of the Plan, to offer institutional funds and even to waive minimum purchase amounts for institutional funds when asked.

119.    Said a bit differently, Shoe Show has carried the same funds in the Plan that a college student would obtain opening a mutual fund online in his dorm room with a $100 investment.  The different cost structures of identical funds exist to allow large customers, like the Plan, to take advantage of its scale as it invests in the fund.  Shoe Show kept the Plan members paying the same fees as the proverbial college student.

120.    Shoe Show potentially had an incentive to force the participants of the Plan to purchase retail, as opposed to institutional, funds because then the recordkeeper would

be less desirous to charge Shoe Show directly for their fees.

121.     The Plaintiffs have no access to board meetings, committee minutes and the like at Shoe Show but based on Forms 5500 filings, Shoe Show may have actively participated in choosing the retail funds to subsidize itself and push costs to its workers.

122.     Discovery will reveal the details of the communications and contractual relationships between MassMutual and Shoe Show.

**Part 2 – Defendants Provided Active, not Passive, Funds, Costing the Plan Millions**

123.     The fact that Shoe Show did not obtain lower cost institutional funds is made more tragic by failing to offer any passively managed funds. This is essentially imparting two additional costs onto the plan participants: one for retail (as opposed to institutional) funds and one for actively (as opposed to passively) managed funds.

124.     Defendants only offer actively managed funds in the Plan.

125.     Defendants did not offer index funds to Plan participants.

126.     The only SEC-registered investment company ("RIC" or "mutual funds) options selected by the Defendants offered in the certified Forms 5500 for 2009 through 2018 were high cost actively managed retail funds.

127.     It is possible, and discovery will reveal, whether the Defendants' failure to procure passively managed funds was due to incompetence or greed.  Like the scenario with institutional versus retail funds, actively managed funds generate higher fees paid by Plan members, such that it relieves pressure on the recordkeeper to charge Shoe Show fees directly.

128. In sum, the Defendants had the option and ability to obtain passive and institutional funds, which would be unequivocally better for the participants, but they failed to do so.

129. Lower cost passive funds and institutional share classes were available based on the Defendants certified Form 5500 in 2009, which shows the Plan had the size and sophistication to obtain both.

130. However, Shoe Show did not take advantage of those offerings, which inured to Shoe Show's benefit and the Plan's detriment.

**Shoe Show Made Some Changes in 2017/18, Acknowledging Prior Errors but Not Fully Correcting Them or Compensating Plan for Them**

131. To the extent that the Defendants who managed the Plan during the class period inherited a flawed Plan, they nonetheless had a duty to correct their predecessors' mistakes. Under ERISA, 401(k) plan fiduciaries have an obligation to correct the breaches of predecessor fiduciaries.

132. The Defendants could easily have used the Financial Industry Regulatory Authority Corporation's[4] free fund analyzer at https://tools.finra.org/fund_analyzer/ to act more prudently at the time they added these new funds in 2018. Once the Defendants realized in 2018 that they needed to take actions to make some trust fund modifications, given an annual turnover of 10% of participant base, Shoe Show should have corrected all

---

[4] In the United States, the Financial Industry Regulatory Authority, Inc. is a private corporation that acts as a self-regulatory organization. FINRA is the successor to the National Association of Securities Dealers, Inc. and the member regulation, enforcement, and arbitration operations of the New York Stock Exchange

earlier plan years and "put the trust back into the condition it would have been should the breaches not have occurred."

133.    Defendants' behavior in 2018 drives these points home.   In 2018, the Defendants replaced some share classes in the Plan with slightly less costly classes. However, these funds' share classes were not the lowest cost options—they were also unnecessarily expensive and detrimental to the Plan's participants.

134.    In 2018 Defendants' chose a fund called Eaton Vance Atlanta Capital SMID-Cap R (ERSMX) for the Plan, which had a 1.44% expense ratio.

135.    The Defendants could have chosen the fund's R6 share class (ERASX).  It is an identical fund but has an expense ratio of 0.84%.  The amount of money in Shoe Show's Plan qualifies it for ERASX, so the 60 basis point difference the Plan paid is inexplicable. The Plan's assets exceed ERASX's minimum purchase requirements.

136.    Exhibit 3 below shows the difference between costs incurred with an initial $10,000 contribution and a 5% rate of return for 20 years as a result of Defendants' choice (on left higher bar versus an identical lower cost R6 version).



137.    Also, the Defendants selected Fidelity Advisor Total Bond M (FEPTX) for

a 0.77% annual cost versus the identical 0.36% version for ticker FBKWX (See Exhibit 4).

| | True No-Load | Expense Ratio | Assets ($millions) | Management Company ID | Manager Name | Inception Date | Name | Symbol |
|---|---|---|---|---|---|---|---|---|
| 1 ▶ | N | 0.770 | 290.7 | 0C00008F1C | O'Neil/Conti/Moore/Fe | 6/16/2004 | Fidelity Advisor® Total Bond M | FEPTX |
| 2 ▶ | Y | 0.360 | 1,527.4 | 0C00008F1C | O'Neil/Conti/Moore/Fe | 12/22/2014 | Fidelity Advisor® Total Bond Z | FBKWX |

138.    Exhibit 4 above shows the data comparing the funds, noting the only

difference is the cost.

139.    FBKWX is a "True No-Load" fund with $1.5 billion dollars versus the

"loaded" version the Defendants selected in 2018 with less than $300 million dollars in

assets.

140.    The less expensive share class does not impose a minimum initial investment

requirement.

141.    Both funds' management personnel are identical and the less costly share class has a much earlier inception date and was available at the time the Defendants imprudently selected the higher cost fund.

142.    The consequence of Defendants choosing FEPTX versus FBKWK is shown modeling a $10,000 initial contribution, 5% growth over 20 years (Exhibit 5):



143.    Inevitably, these higher cost funds caused inferior performance for the Plan and trust as well as the participants en masse.  After all, Defendants just needed to pick up the phone and call MassMutual and demand the exact same fund with a lower cost structure.    And, while making changes to the Plan in 2017, the Defendants should have insisted that they obtain better funds across the board that met and, truly, exceeded the Plan's minimum purchase requirements.

35

144.    Courts recognize that fiduciaries controlling large sums of money have the duty to make simple inquiries for lower cost funds. *See, for discussion, e.g. Tibble v. Edision International*, CV 07-5359 SVW, *53-64 (C.D. Cal. order July 8, 2010).

145.    Defendants exhibited a lack of skill, lack of prudence, and a lack of loyalty for adding these two new higher cost retail versions of the mutual funds and retaining these funds afterward.

146.    And, Defendants had the information they needed to make a good decision going back to the beginning of the class period.

### Illustrations of Damages to Plan Members from Expensive Funds

147.    The following Exhibits show five instances where the Defendants picked an expensive fund for no good reason, showing the resulting loss of investment that had necessarily occurred as of March 31, 2014.  The solid color bar height represents prior three year returns for funds selected by the Defendants as of the first quarter of the first plan year of the class period (3/31/2014).

*Exhibit 6*



*Exhibit 7*



*Exhibit 8*



**3-YR AVG %; AS OF 3/31/14; R6 AVAIL 5/1/2013 COST .39%**

- Defendant choice: Franklin Income R; cost .97%
- Franklin Income Adv; cost .47%

*Exhibit 9*



**3-YR AVG %; AS OF 3/31/14; CHGD TO R3 2018 (COST .84%) WHEN ACT OCCURRED EVEN THOUGH R6 AVAIL FOR .48%**

- Defendant choice: MFS Total Return Bond R2; cost 1.16%
- MFS Total Return Bond R6; cost .57%

38

*Exhibit 10*



148.    Based on this information Defendants violated their own plan documents and investment policy since MassMutual's investment policy states in part:

(A)    The particular investments should pursue the following standards:

(i)    Performance equal to or greater than the median return for an appropriate, style-specific benchmark and peer group over a specified time period.

(ii)    Specific risk and risk-adjusted return measures should be established and agreed to by [Plan Sponsor/investment committee] and be within a reasonable range relative to an appropriate, style-specific benchmark and peer group.

(iii)    Demonstrated adherence to the stated investment objective.

39

Competitive fees compared to similar investments.

(iv)  An investment manager that provides all performance, holdings, and other relevant information in a timely fashion, with specified frequency.

149.  The Defendants violated 29 U.S.C. § 1104(a)(1). The ERISA statute requires fiduciaries to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent" with ERISA. 29 U.S.C. §1104(a)(1)(D).

150.  Because the Defendants did not select or retain any passive investments, the burden[5] on the Defendants to "justify" their selection and monitoring process increases, as does their burden to monitor those choices to ensure they are prudent.

151.  For example, investments managed by humans versus index funds can quickly turn from out-performers to under-performers as we see by the Defendants' choice below when in 2011 the American Funds New Economy R1 fell below its peer median to the bottom quartile in December of 2011, specifically. The fund performed in that way through the end of the 2014 year when the Defendants failed to act over many years after the beginning of the Class period, as displayed in exhibit 11 below.

---

[5] The American Law Institute, 1992, Restatement of the Law Third, Trusts—Prudent Investor Rule: "The greater the trustee's departure from one of the valid passive strategies, the greater is likely to be the burden of justification and also of continuous monitoring."



152.    Interestingly, in 2018 the Defendants began to offer workers a slightly cheaper "R3" version of some investment offerings already in the Plan Oddly, the most expensive "R1" share class of the American Funds New Economy and Europacific Growth funds were left untouched. It is thus obvious that the Defendants could have, but did not, monitor the fee structures of the Plan until that time.   There had been no dramatic growth in the Plan between 2016 and 2017 to suggest the Plan was in a different bargaining position during 2017.  The 2017 5500 Form shows net plan assets of $36,637,901 at year beginning and $50,220,366 at year end.

153.    Nothing prevented defendants from making similar changes much earlier and only meeting minutes can reveal why it took so long to make the changes they did and why the most egregiously expensive share classes were not replaced.

154.    Assuming that the Defendants realized as early as 2017 that they imprudently managed the Plan, thus prompting some changes, there is no evidence that they retroactively corrected the imprudence and restored money to the Plan that it had allowed MassMutual to overcharge, nor did the Defendants terminate MassMutual's role as recordkeeper, or at a minimum, restructure its contract.

155.    In conclusion, both because of the excessive fees the Defendants allowed MassMutual to receive, and a lack of effort to bargain for better funds, the Plan was filled with expensive funds that cost the Plan's participants millions of dollars.

### ILLUSTRATION OF COMPOUNDED COSTS TO WORKERS WHEN DEFENDANTS PERMITTED REVENUE SHARING FOR EVERY MUTUAL FUND SINCE 2009

156.    Exhibit 12 below illustrates an example whereby a hypothetical participant invests in just one fund, with an account balance of $31,578 on 1/1/2015.  The chart shows the difference in the participant's balance with the poor retail funds versus similar institutional funds available to the Defendants.  For example, the American Funds New Economy R1 share class cost the participant $2,384.27 over the class period versus the R6. The Plan's R1 share's actual fund future value over 5 years from 3/31/15 to 3/31/20 based on growth rates in the SEC prospectuses and at MassMutual's website is $42,259.  Had the Defendants used the R6 version, however, the hypothetical participant's account value would be $44,643; a 6% increase over the Defendants' choice.

| Fund | Growth 3/31/15 to 3/31/20 | Cost for using Revenue Sharing funds | MassMutual fee per part./yr | MassMutual Fee Total/year | Flat per head & total fee/part./yr | Flat per head total fee/part./yr |
|---|---|---|---|---|---|---|
| American Funds New Economy R1 | $42,258.99 | ($2,384.27) | | | | |
| American Funds New Economy R6 | $44,643.27 | | | | | |
| Franklin High Income R | $33,718.30 | ($1,163.87) | | | | |
| Franklin High Income R6 | $34,882.17 | | | | | |
| Franklin Income R | $32,796.74 | ($1,071.59) | | | | |
| Franklin Income R6 | $33,868.33 | | | | | |
| Invesco Growth and Income R | $30,905.26 | ($1,069.83) | | | | |
| Invesco Growth and Income R6 | $31,975.09 | | | | | |
| MFS Total Return Bond R2 | $35,019.17 | ($1,041.23) | | | | |
| MFS Total Return Bond R6 | $36,060.40 | | | | | |
| Average | | -$1,346.16 | $203.62 | $231,105.73 | $60.00 | $68,100.00 |

42

157.    Warren Buffett and Wharton School of Business assert that an average expected return of stocks and bonds is ~5% per year (Gross Domestic Product (GDP) plus the rate of inflation). When taking an asset-based fee of 0.73% out of the investors' expected return for a commodity like recordkeeping that is better priced on a per participant level means that investors are increasingly spending more for that commodity as they save more.

158.    The extra cost equates to about 15% of their expected returns every year (the revenue sharing amount divided by the expected return of the fund 0.73%/5%). Because of the egregious costs bourne by plan participants, responsible plan fiduciaries have moved away from these revenue sharing arrangements. In addition to the earlier cited NEPC study identifying average recordkeeping costs, Deloitte and the 401k Averages Book offer further support that the Defendants, against industry trends and norms, failed to act on behalf of the participants' best interests.

(A)     According to the 2019 edition of the Deloitte Defined Contribution Benchmarking Survey, the "average per-participant direct fee reported was $54, up from $50 in 2017, with the **consistent trend of not utilizing investment revenue to pay fees**."

(B)     In Exhibit 12 MassMutual makes $203.62 per participant per year. The 15th edition of the 401k Averages Book with data at the beginning of the Class period of 9/30/14 states that a $20,000,000 plan with 2,000 participants (According to the 5500 record, the Plan held $28M in assets with 1,120

43

participants on 1/1/2013). Chart 16.5 on page 104 of the Averages Book states that average recordkeeping costs were $33,828 and high cost plans were $99,852. Dividing the average and high costs by 2,000, the per participant fees range from $17 up to $50. The Defendants knew or should have known that their fees were far outside acceptable norms.

159. According to NEPC:

    (A)    As of September 22, 2016 – Overall plan fees reach an all-time low

    (B)    81% of plans have renegotiated their fees since 2013

    (C)    Use of index funds continues to rise

## B. SHOE SHOW FAILED TO DIVERSIFY (29 U.S.C. § 1104(A)(C))

160. As was discussed in the definition section, one critical aspect of ERISA's duty of prudence is the duty to diversify. ERISA requires that a fiduciary "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(C). The duty to diversify requires, among other things, diversity not only among specific securities but also among industries or sectors.

161. Correlation is an industry standard that measures how different securities move in tandem. A diversified portfolio should consist of a portfolio of securities that do not move in unison. Two securities that are perfectly correlated is a 1. Two securities that are perfectly inversely correlated is -1. Two securities that have no correlation is 0 – often referred to as low correlation.

44

162.    Modern Portfolio Theory ("MPT"), the industry standard for prudent

portfolio management for over twenty years, employs the use of correlations for identifying

categories and sectors that are loosely correlated and do not move in tandem. Creating a

diversified portfolio of fixed income securities from multiple sectors and sub-sectors, and

multiple categories, which have low correlations, is the foundation of MPT.

163.    Financial professionals generally believe that asset allocation is the most

important determinant of variability of returns, accounting for more than 90 percent of the

differences in performance across portfolios. This assertion stems from the well-known

studies by Brinson, Hood, and Beebower which state, "…investment policy dominates

investment strategy (market timing and security selection), explaining on average 93.6

percent of the variation in total plan return." (Ibbotson Associates, ed. Stocks, Bonds, Bills,

and Inflation 2005 Yearbook. Chicago: Ibbotson)

164.    In simple terms, asset allocation is simply the mix of stocks, bonds, cash, and

other investments (such as, potentially, gold and real estate) in a portfolio.

165.    Under ERISA, fiduciaries have the duty to investigate alternative

investments to determine if other investments are available which might deliver appropriate

benefits for less risk.

166.    The Defendants' equity (stock) fund choice correlations amongst one another

provided no meaningful diversifying benefit.  See in the Exhibit below the prevalence of a

>90% correlation:

*Exhibit 13*

| Name--Average Correlation = 90% | Ticker | RNGAX | ACGLX | MRDVX | GTMRX | GOGFX | ODVNX | RWIBX | MGALX | MAWAX |
|---|---|---|---|---|---|---|---|---|---|---|
| American Funds New Economy R1 | RNGAX | - | 0.89 | 0.89 | 0.93 | 0.86 | 0.88 | 0.95 | 0.96 | 0.96 |
| Invesco Growth and Income R | ACGLX | 0.89 | - | 0.97 | 0.86 | 0.91 | 0.78 | 0.9 | 0.92 | 0.92 |
| BlackRock Equity Dividend R | MRDVX | 0.89 | 0.97 | - | 0.86 | 0.9 | 0.82 | 0.93 | 0.94 | 0.95 |
| Goldman Sachs Small/Mid Cap Growth R | GTMRX | 0.93 | 0.86 | 0.86 | - | 0.89 | 0.8 | 0.86 | 0.92 | 0.93 |
| Victory Sycamore Small Company Opp R | GOGFX | 0.86 | 0.91 | 0.9 | 0.89 | - | 0.77 | 0.84 | 0.89 | 0.9 |
| Invesco Oppenheimer Developing Markets R | ODVNX | 0.88 | 0.78 | 0.82 | 0.8 | 0.77 | - | 0.92 | 0.91 | 0.9 |
| American Funds Capital World Gr&Inc R2 | RWIBX | 0.95 | 0.9 | 0.93 | 0.86 | 0.84 | 0.92 | - | 0.97 | 0.97 |
| MFS Growth Allocation R2 | MGALX | 0.96 | 0.92 | 0.94 | 0.92 | 0.89 | 0.91 | 0.97 | - | 1 |
| MFS Aggressive Growth Allocation R2 | MAWAX | 0.96 | 0.92 | 0.95 | 0.93 | 0.9 | 0.9 | 0.97 | 1 | - |

167.   In other words, the portfolio the Defendants selected provided little diversification among the equity funds.

168.   The Defendants had available MassMutual's recommended investment policy.

169.   The policy states: "The Plan intends to provide an appropriate range of investment options that will span the risk/return spectrum and allow Plan participants to construct portfolios consistent with their unique individual circumstances, goals, time horizons and tolerance for risk. Major asset classes to be offered may include: Stable Value, Fixed Income (multiple categories), Asset Allocation (lifestyle and balanced), Large Cap Equity (multiple styles), Multi Cap Equity (multiple styles), Mid Cap Equity (multiple styles), Small Cap Equity (multiple styles), International/Global (multiple styles and categories), Specialty (sector and other narrowly defined options) and Self-Directed Brokerage Account."  Defendants' actions did not meet this policy.

**CLASS ACTION ALLEGATIONS**

170.   Plaintiffs bring this action pursuant to Rule 23 on behalf of the class of persons described herein and on behalf of the Plan. Plaintiffs reserve the right to revise

46

their class definitions and to propose other or additional classes in subsequent pleadings or their motion for class certification, after discovery in this action.

171.    Plaintiffs Sarah Smith, Michael Crisco, and Jeffrey Morrow assert the Counts against Defendants on behalf of the Shoe Show, Inc. Plan and in acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan.

172.    <u>Numerosity</u>: The Classes are so numerous that joinder of all Class members is impracticable. The Plan had between approximately 1,200 participants at the start of the applicable statutory period.

173.    <u>Typicality</u>: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are current or former participants in the  Plan,  who have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other class members with regard to the  Plan. Defendants managed the Plan as a single entity, in an omnibus account, and therefore Defendants' imprudent decisions affected all Plan participants similarly. Members are trust beneficiaries of the same trust and use the same custodian and same recordkeeping system. According to the 2014 Form 5500 audit report: "Note "General: The Plan is a defined contribution plan sponsored by Shoe Show, Inc. (the Plan sponsor) covering all full-time employees who have completed one year of service (as defined in the Plan agreement) and

47

are age twenty-one or older. *The Plan Administrator is responsible for oversight of the Plan. The Board of Trustees and Plan Administrator determine the appropriateness of the Plan's investment offerings and monitor investment performance*. The Plan provides for participant-directed investment programs and is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA)."

174.    These mutual fund securities are NOT registered to or owned by Plan participants—unlike individual retirement accounts (IRA). The plan's trust ("Reliance Trust" per Forms 5500) owns the SEC-registered securities and the trust buys and sells them at an "omnibus" or net aggregate trust level and settles the shares every evening with the recordkeeper (who updates an accounting record for each plan participant every evening (called "daily valuation")).[6]

175.    Therefore, each Shoe Show plan participant or Class member is simply a member of the trust or a beneficiary trading via a common trust company ("Reliance Trust") and a common recordkeeping firm (MassMutual) to maintain their accounts. Plaintiff's claims are typical of the claims of the Class. They have no interests that are antagonistic to the claims of the Class. Questions of law and fact are common to the members of the Class and predominate over individual questions. They understand that this matter cannot be settled without the Court's approval.

---

[6] https://www.dtcc.com/-/media/Files/Downloads/Investment-Product-Services/Wealth-Management-Services/Funds/WMS-Mututal-Funds-DCCS-TRI-Schematic.pdf

48

176.    "A trustee (and thus an ERISA fiduciary) has a continuing duty to monitor...investments and remove imprudent ones. This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset.". (internal citations and quotation marks omitted). This monitoring "is to be done in a manner that is reasonable and appropriate to the particular investments, courses of action, and strategies involved." (internal citations and quotation marks omitted). Trust law states that "a trustee is to 'incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship.'" *Tibble v. Edison International*, 843 F.3d 1187, 1197 (9th Cir. 2016) (quoting Restatement (Third) of Trusts § 90(c)(3)). Indeed, "'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and renewing investments.'" *Id.* at 1197-98. (quoting Restatement (Third) of Trusts § 90, cmt. b). A fiduciary's decision to invest in a fund that charges higher fees to a beneficiary will shrink the beneficiary's original investment. "Beneficiaries subject to higher fees to materially identical funds lose not only the money spent on higher fees, but also  the money that the portion of their investment spent on unnecessary fees would have earned over time." *Id.* at 1198.

177.    <u>Adequacy</u>:    Plaintiffs will fairly and adequately protect the interests of the Classes, as their interests are aligned with the Class' interest in that they seek to represent and they have retained counsel experienced in class action litigation and possess good

knowledge of ERISA. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

178.    Fitzgerald Law, P.C. ("Fitzgerald Litigation) agrees to advance the costs of this action contingent upon the outcome, and it is aware that no fee can be awarded without the Court's approval.

179.    Laura Greene is also assisting with this matter.  She has an LLM in tax from the University of Alabama.  She is a sole proprietor and was admitted to the bar in 2011.

180.    <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

(A)     Whether Defendants breached their duties of prudence and loyalty by failing to adequately monitor and control the Plan's administrative costs, especially but not exclusively payments to MassMutual, and similarly whether Defendants had processes in place to build and maintain a prudent Plan;

(B)     Whether the indirect compensation and/or revenue sharing payments received by Shoe Show, Inc., or any covered service provider (CSP) exceeded reasonable compensation for the services provided, thus constituting a prohibited transaction with a fiduciary and party-in-interest under 29 U.S.C. § 1106;

(C)     Whether the collection of indirect compensation/revenue sharing payments in excess of the cost of the services provided to the Plan constitutes an illegal inurement of benefit to the Plan sponsor in violation of 29 U.S.C. § 1103 and/or constitutes a prohibited transaction under 29 U.S.C. § 1106;

(D)     Whether Defendants breached their duties of prudence and loyalty by failing to monitor and remove the Plan's investments in Shoe Show, Inc. plan;

(E)     Whether the expenses paid by participants invested in the Shoe Show, Inc. funds exceeded that which was reasonable and constituted a prohibited transaction with a fiduciary and a party-in-interest under 29 U.S.C. § 1106;

(F)     Whether Defendants failed to exercise appropriate skill, care, loyalty, and diligence by failing to investigate and attempt to negotiate lower-cost alternatives to the Shoe Show, Inc. plan;

(G)     Whether Defendants breached their duty to properly select plan investments and remove imprudent investments;

(H)     Whether Defendants breached their duty to monitor plan investments and remove imprudent investments;

(I)     Whether Defendants properly diversified the investments in the Plan and the monetary benefit to the Plan members had the Plan been properly diversified;

(J)     The proper measure of monetary relief; and

51

(K)    The proper form of equitable and injunctive relief.

181.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class. Separate lawsuits would establish incompatible standards to govern Defendants' conduct as fiduciaries.

182.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual class members, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court such as removal of particular Plan investments or removal of a plan fiduciary would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

183.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct described in this Complaint applied uniformly to all members of the Classes.

184.    Class members do not have an interest in pursuing separate actions against

Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis.

185.    Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices.

186.    Moreover, management of this action as a class action will not present any likely difficulties.

187.    In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

<u>**COUNT I**</u>
<u>**BREACH OF DUTIES OF LOYALTY AND PRUDENCE, 29 U.S.C. § 1104(A)(1)(A)–(B) & FAILING TO ACT IN ACCORDANCE WITH THE DOCUMENTS AND INSTRUMENTS GOVERNING THE PLAN 29 U.S.C. §1104(a)(1)(D)**</u>

188.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

189.    29 U.S.C. § 1104 imposes the fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

190.    During the Class Period, the Defendants were named fiduciaries pursuant to ERISA§ 402(a)(1) [29 U.S.C. § 1102(a)(1)], or de facto fiduciaries within the meaning of ERISA § 3(21)(A) [29 U.S.C. § 1002(21)(A)], or both.

191.    Defendants breached their duties of loyalty and prudence by:

(A)    Providing only more expensive retail share classes rather than institutional shares;

(B)    Having only actively managed rather than the less fee intensive passively managed fund options;

(C)    Allowing MassMutual to charge excessive fees;

(D)    The breaches and issues described more fully in the motion above for class certification, and;

(E)    Not negotiating with service providers to lower costs.

192.    29 U.S.C. § 1104 imposes the fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

193.    Based on the Forms 5500 from 2009 to date, most, if not all, of the Plan's investments failed because the Defendants' processes were flawed.

194.    As described throughout the Complaint, Defendants Shoe Show, Inc., the Plan, Jack Van Der Poel, Mr. Tucker, Mrs. Tucker, and Spencer Northcutt breached their fiduciary duties of prudence and loyalty related to non-investment administration of the Plan by failing to take reasonable steps to manage administrative costs of the Plan.

195.    On or before January 1, 2009, these Defendants hired Hartford as the provider of all major accounting and recordkeeping services.

196.     In 2012, Hartford sold their entire recordkeeping business to MassMutual who effectively inherited Shoe Show as a client.

197.     Since hiring Hartford, the Defendants have not engaged in an objective, competitive process to hire the lowest cost provider for this service. This fact fits precisely into the Supreme Court's continuing liability theory for actions before the beginning of the limitations period.

198.     These Defendants also failed to take prudent steps to monitor and control administrative costs on an ongoing basis, such as hiring a consultant to conduct a benchmarking study, submitting an RFI and RFP to other service providers to solicit information and competitive bids, and hiring those service providers with the most competitive pricing and services.

199.     According to the Labor Department's rules, their failure to adequately monitor the performance and costs of all service providers constitutes a neglect of their responsibilities as a fiduciary and violates the fiduciary responsibility and prudence standards required by ERISA Sections 404(1)(1)(A) and (B).

200.     Defendants breached their fiduciary duties of prudence and loyalty with respect to selection and management of the Plan's investment options by, inter alia:

>     (A)     Failing to act "solely and exclusively" for the benefit of participants by selecting and retaining investments in the Plan NOT because they merited inclusion after a thorough investigation but because they would generate

55

more revenue for MassMutual and therefore, the Defendants would not receive an invoice for recordkeeping;

(B)     Selecting and maintaining mutual funds in the Plan based upon their willingness to pay revenue sharing and/or indirect compensation rather than selecting identical lower-cost versions that may not have been willing to pay revenue sharing but would increase compounded growth of participants' accounts;

(C)     Negotiating large revenue sharing payments in lieu of attempting to negotiate lower investment management expenses or refunding larger portions of investment management expenses to Plan participants;

(D)     Failing to monitor Plan investments and explore whether the mutual fund investment management services could be provided at lower cost, despite the fact that lower cost funds' assets were orders of magnitude larger as seen at Morningstar®.com (meaning they were NOT choosing the institutional versions used predominately by most pensions and most larger 401k plans);

(E)     Failing to conduct a prudent and objective review of the Plan's investments and failing to remove the imprudent, costly and underperforming funds;

(F)     Failing to conduct a prudent and objective review of the Plan's investments' correlations to one another and protect investors from account losses;

201.    The Supreme Court also held that this [monitoring] duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset . . . . the trustee must 'systematic [ally] conside[r] all the investments of the trust at regular intervals' to assure that they are appropriate."

202.    According to the Plan's annual independent audit, "the Plan Administrator is responsible for oversight of the Plan. The Board of Trustees and Plan Administrator determine the appropriateness of the Plan's investment offerings and monitor investment performance." Once Plaintiffs obtain the Plan's Adoption Agreement, Meeting Minutes, etc. a more formal and precise list of Defendants and breaches can be asserted. As described throughout the Complaint, Defendants Shoe Show, Inc., the Plan and the individual defendants during the Class Period breached their fiduciary duties of prudence and loyalty related to administration of the Plan by failing to take reasonable steps to manage administrative costs of the Plan.

203.    These Defendants hired LPL Financial, MassMutual and others as service providers to further the profit of Shoe Show without engaging in an objective, competitive process to hire unconflicted and reasonably compensated providers that were necessary for operation of the plan.

204.    These Defendants also failed to follow plan documents and take prudent steps to monitor and control investment and administrative costs on an ongoing basis, such as hiring a consultant to conduct a benchmarking study, submitting an RFI and RFP to other service providers to solicit information and competitive bids, and hiring those service providers with the most competitive pricing and services.

205.    Shoe Show, Inc. is liable as a co-fiduciary under 29 U.S.C. § 1105 given its authority to appoint and remove members of the committees, its knowledge of each Defendants' breach of fiduciary duties, and its failure to exercise its authority to take reasonable steps to prevent these breaches.

206.    Each Defendant performing non-investment-related duties also knowingly participated in the breaches of the other Defendants performing such duties, knowing that other Defendants were breaching their fiduciary duties, and enabling commission of these breaches by failing to lawfully discharge their own fiduciary duties or make any reasonable effort under the circumstances to remedy other Defendants' breaches.

207.    Each Defendant is personally liable, and Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3), to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count.

208.    On behalf of the Plan, Plaintiffs also seek appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3) (as described in the Prayer for Relief), recovery of pre-

58

judgment interest, *see Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1030– 31 (4th Cir. 1993); *Meyer v. Berkshire Life Ins. Co.*, 250 F. Supp. 2d 544, 574 (D. Md. 2003), and attorney fees and costs pursuant to 29 U.S.C. § 1132(g).

## COUNT II
## VIOLATION OF ERISA §§ 404(a)(1)(B) and (C)
### BREACH OF DUTIES OF PRUDENCE AND DIVERSIFICATION

209.    Plaintiffs reallege and incorporate by reference the proceeding paragraphs as if set forth fully herein.

210.    Defendants were fiduciaries, as discussed above, for the Plan and their participants, including Plaintiffs and the proposed Class.

211.    A fiduciary must comply with the duty of prudence, which includes, *inter alia*, the duty to diversify and to monitor and remove improper investments. In carrying out these duties, fiduciaries must comply with the care, skill, prudence, and diligence of a prudent person under the circumstances then prevailing.

212.    The U.S. Department of Labor ("DOL") and case law have interpreted this duty. In order to comply with the duty of prudence, a fiduciary must give "appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role that the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties." 29 C.F.R. § 2550.404a-1(b)(1) "Appropriate consideration," according to DOL regulations, includes but is not necessarily

59

limited to: "(i)[a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or whether applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and (ii) [c]onsideration of the following factors …:

> (A)     [t]he composition of the portfolio with regard to diversification,
>
> (B)     [t]he liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and
>
> (C)     [t]he projected return of the portfolio relative to the funding objectives of the plan." 29 C.F.R. § 2550.404a-1(b)(2).

213.    Defendants' conduct with respect to the Plan violated in numerous ways their fiduciary duties of prudence and diversification as alleged above.

214.    Defendants, for example, lacked a basic emerging market fund or real estate fund in the Plan that would have greatly helped participants diversify.

215.    This Count focusses primarily on the diversification deficiencies described above.  The Plan is not constructed in a way to allow participants to diversify their investments, and thus they are unable to maintain a good portfolio.

216.    Defendants' actions directly and proximately caused substantial financial harm to Plaintiffs and the proposed Class. As a result of this wrongdoing,

217.    Defendants are liable for all resulting loss and damage.

<u>**COUNT III**</u>

**Prohibited Transactions with a Party-In-Interest under 29 U.S.C. § 1106(a)(1)**

218.    Plaintiffs reallege and incorporate by reference the proceeding paragraphs as if set forth fully herein.

219.    MassMutual is a party in interest to the plan and the Defendants are fiduciaries. Defendants paid MassMutual excess compensation and that must be restored to the plan participants.

220.    The factual findings of how MassMutual was excessively paid were discussed above in the complaint. The relationship between the Plan and MassMutual resulted in MassMutual being paid via excessive 12b-1, sub-transfer agent fees and recordkeeping fees.

221.    MassMutual's excessive payment was a result of the Defendants' and plan fiduciaries' prohibited transactions and breach of fiduciary duties.

222.    As described throughout the Complaint, in violation of ERISA Section 408(b)(2) Defendants caused the Plan to use conflicted providers and investments that not only were not "necessary for operation of the Plan" but who excessive compensation constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation and a transfer of assets of the Plan to a party in interest.

223.    As described throughout the Complaint, Defendants caused the Plan to incur revenue sharing costs knowing that the payments greatly exceeded the value of services

61

provided to the Plan and therefore constituted a prohibited transaction under 29 U.S.C. § 1106(a)(1).

224.    As described throughout the Complaint, Defendants knew or should have known LPL, MassMutual and others would receive excessive compensation for these services directly or indirectly from Plan assets which constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation and a transfer of assets of the Plan to a party in interest.

225.    As a direct and proximate result of these prohibited transactions, the Plan directly or indirectly paid millions of dollars in administrative and investment management and other fees to parties-in-interest in transactions that were prohibited under ERISA, thereby suffering millions of dollars in losses.

226.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Shoe Show, Inc. and the Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all revenues received and/or earned resulting directly or indirectly from the above-mentioned prohibited transactions. Plaintiffs also seek appropriate equitable relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(3).

227.    "The transactions covered by Section 406(a)(1) 'are per se violations of ERISA regardless of the motivation which initiated the transaction, the prudence of the transaction, or the absence of any harm arising from the transaction.'" *Gray v. Briggs*, 45 F. Supp. 2d 316, 326 (S.D.N.Y. 1997) (quoting Reich v. Polera Bldg. Corp., No. 95 Civ.

3205, 1996 U.S. Dist. LEXIS 1365 , [1996 BL 718 ], 1996 WL 67172 , *2 (S.D.N.Y. Feb. 9, 1996)).

228.    And although § 406  speaks in terms of restrictions on fiduciaries, "[t]he Supreme Court has held that equitable claims based on § 406(a) violations may be brought against non-fiduciaries under ERISA § 502(a)(3)  ." Patrico v. Voya Fin., Inc., No. 16 Civ. 7070, [2017 BL 212065 ], 2017 U.S. Dist. LEXIS 95735 , [2017 BL 212065 ], 2017 WL 2684065 , at *4 (S.D.N.Y. June 20, 2017) (citing Harris, 530 U.S. at 245-51).

229.    Therefore, plaintiffs seek remedies available to them and the Plan to remedy the prohibited transactions.

**PRAYER FOR RELIEF**

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

(1)    find and declare that Defendants have breached their fiduciary duties as described above;

(2)    find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties or prohibited transaction, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duties;

(3)    determine the method by which plan losses and fiduciary profits should be calculated, and order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. §1109(a);

(4)     find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plan;

(5)     impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plan;

(6)     remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

(7)     surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive and/or in violation of ERISA;

(8)     order equitable restitution against the Defendants;

(9)     certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Fitzgerald Litigation and Laura Greene as Lead Class Counsel;

(10)    award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

(11)    allow a jury trial on any matter herein, if any, trial by a jury.  Plaintiff is aware that under ERISA a jury trial is, under existing law, not permitted.  However, plaintiff makes the jury demand to preserve a right to a jury should there be a change in law or amendment to the pleadings that makes a jury trial permissible in the future;

(12)    order the payment of interest to the extent it is allowed by law; and

(13)    grant other equitable or remedial relief as the Court deems appropriate.

Respectfully submitted, this the 3rd day of September, 2020.

By: _/s/ Andrew L. Fitzgerald_____
        Andrew L. Fitzgerald
        N.C. State Bar No. 31522
        FITZGERALD LITIGATION
        119 Brookstown Ave., Ste. 402
        Winston-Salem, NC 27101
        Telephone: (336) 793-4365
        Facsimile: (336) 793-4696
        Email: andy@fitzgeraldlitigation.com