IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


SARAH SMITH, MICHAEL CRISCO,       )
and JEFFREY MORROW,                )
individually and as                )
representatives of a class of      )
similarly situated persons,        )
                                   )
          Plaintiffs,              )
                                   )
     v.                            )          1:20CV813
                                   )
SHOE SHOW, INC.; BOARD OF          )
TRUSTEES OF SHOE SHOW              )
RETIREMENT SAVINGS PLAN; JOHN      )
VAN DER POEL, ROBERT TUCKER,       )
and LISA TUCKER,                   )
                                   )
          Defendants.              )


## <u>MEMORANDUM OPINION AND ORDER</u>

**OSTEEN, JR., District Judge**

Presently before the court is a Motion to Dismiss
Plaintiffs' Complaint under Federal Rule of Civil Procedure
12(b)(6) filed by Defendants Shoe Show, Inc., Board of Trustees
of Shoe Show Retirement Savings Plan, John Van Der Poel, Robert
Tucker, and Lisa Tucker (together, "Defendants"). (Doc. 11.)
Individually and as representatives of a class of similarly
situated persons, Plaintiffs Sarah Smith, Michael Crisco, and
Jeffrey Morrow (together, "Plaintiffs") responded in opposition.
(Doc. 20.) Defendants filed a reply. (Doc. 22.)

For the reasons set forth herein, this court will grant in part and deny in part Defendants' Motion to Dismiss. This court will dismiss some of the claims asserted under Count I, dismiss the entirety of Count II, and decline to dismiss Count III.

## I. <u>FACTUAL BACKGROUND</u>

On a motion to dismiss, a court must "accept as true all of the factual allegations contained in the complaint . . . ." <u>Ray v. Roane</u>, 948 F.3d 222, 226 (4th Cir. 2020) (internal quotation marks omitted) (quoting <u>King v. Rubenstein</u>, 825 F.3d 206, 212 (4th Cir. 2016)). The facts, taken in the light most favorable to Plaintiffs, are as follows.

Defendant Shoe Show, Inc. ("Shoe Show"), a footwear retailer with over 1,100 stores across forty-seven states, sponsors a tax-qualified, defined contribution retirement plan (the "Plan") for eligible current and former employees. (Compl. – Class Action ("Compl.") (Doc. 1) ¶¶ 15-19, 21.)[1] This type of plan, commonly referred to as a 401(k), allows participants to direct their retirement savings contributions into various investment fund options offered by the Plan. (<u>Id.</u> ¶ 1.) The Plan is "relatively large," (<u>id.</u> ¶ 106), with over 1,500 participants

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

and total assets over $40 million, (Ex. F, 2019 Form 5500 (Excerpts) (Doc. 12-6) at 3, 5).[2] Plaintiffs are former Plan participants. (Compl. (Doc. 1) ¶¶ 10-12.) Defendants are Plan fiduciaries and responsible for its administration. (Id. ¶¶ 2-3, 22-28, 29.) During the relevant time period, MassMutual served as the Plan's recordkeeper and was responsible for tracking "who [wa]s in the plan, what they own[ed], and what money [wa]s going in and out." (Id. ¶¶ 28, 47.)

Plaintiffs allege that since 2014, Defendants have been in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq., by breaching their fiduciary duties and engaging in prohibited transactions with a party in interest. (Compl. (Doc. 1) ¶¶ 9, 188-229.) Plaintiffs'

_____

[2] Even though Plaintiffs have not attached the Plan's Form 5500 annual report filings to their Complaint, there are two reasons why this court may consider them at the motion to dismiss stage. First, the filings are "integral to and explicitly relied on in the [C]omplaint and . . . [P]laintiffs do not challenge [their] authenticity." Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999). Indeed, Plaintiffs' Complaint references the Form 5500s repeatedly. (E.g., Compl. (Doc. 1) ¶¶ 2, 4, 20, 61, 97.) Second, the filings may be considered because "[i]n reviewing a Rule 12(b)(6) dismissal, [courts] may properly take judicial notice of matters of public record." Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Here, the Form 5500s are unquestionably matters of public record. They are filed with the United States Department of Labor and are publicly available online. U.S. Dep't of Labor, Form 5500 Search, EFAST, https://www.efast.dol.gov/5500search/ (last visited Feb. 22, 2022) (enter "Shoe Show, Inc." in "Sponsor Name" field).

- 3 -

factual foundation for these claims rests on Defendants': (1) failure to limit MassMutual's fees, (2) failure to offer the most affordable share classes, (3) failure to offer passive funds, and (4) failure to diversify the Plan's equity funds. (Id. ¶¶ 94-169.) These factual allegations are described in greater detail in Part IV's analysis, infra.

## II.   PROCEDURAL BACKGROUND

Plaintiffs filed their Complaint on September 3, 2020. (Compl. (Doc. 1).) Plaintiffs assert three ERISA counts: (I) breach of the fiduciary duties of prudence, monitoring, loyalty, and the obligation to act in accordance with Plan documents and instruments; (II) breach of the fiduciary duties of prudence and diversification, and (III) prohibited transactions with a party in interest. (Id. ¶¶ 188-229.) Defendants filed a Motion to Dismiss Plaintiffs' Complaint on November 16, 2020, (Doc. 11), along with an accompanying Memorandum, (Mem. of Law in Supp. of Defs.' Mot to Dismiss Pls.' Compl. ("Defs.' Br.") (Doc. 12)). Plaintiffs responded in opposition, (Resp. in Opp'n to Defs.' Mot to Dismiss ("Pls.' Br.") (Doc. 20)), and Defendants replied, (Defs.' Reply in Supp. of Mot. to Dismiss Pls.' Compl. ("Defs.' Reply") (Doc. 22)). Plaintiffs then filed a notice of subsequently decided authority

- 4 -

regarding the United States Supreme Court's ruling in <u>Hughes v. Northwestern University</u>, 142 S. Ct. 737 (2022). (Doc. 25.)

Additionally, Plaintiffs have filed a Motion for Class Certification and Appointment of Fitzgerald Law as Class Counsel, (Doc. 16), along with an accompanying Memorandum, (Doc. 17). This court postponed further briefing on and determination of Plaintiffs' Motion for Class Certification "until further order of this court." (Doc. 21 at 2.) Because this Memorandum Opinion and Order will grant in part and deny in part Defendants' Motion to Dismiss, this court finds that it is now appropriate for briefing on Plaintiffs' Motion for Class Certification to proceed. This court will order the parties to propose a briefing schedule in their Federal Rule of Civil Procedure 26(f) report to this court.

## III. **STANDARD OF REVIEW**

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and

demonstrates "more than a sheer possibility that a defendant has acted unlawfully." Id. When ruling on a motion to dismiss, this court accepts the complaint's factual allegations as true. Id. Further, this court liberally construes "the complaint, including all reasonable inferences therefrom . . . in the plaintiff's favor." Est. of Williams-Moore v. All. One Receivables Mgmt., Inc., 335 F. Supp. 2d 636, 646 (M.D.N.C. 2004). This court does not, however, accept legal conclusions as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

## IV. **ANALYSIS**

Plaintiffs advance three ERISA counts: (I) breach of the fiduciary duties of prudence, monitoring, loyalty, and the obligation to act in accordance with Plan documents and instruments; (II) breach of the fiduciary duties of prudence and diversification; and (III) prohibited transactions with a party in interest. (Compl. (Doc. 1) ¶¶ 188-229 (citing 29 U.S.C. §§ 1104(a)(1), 1106(a)(1)).) All three counts are predicated on allegations that the Plan is governed by ERISA and Defendants are Plan fiduciaries. (E.g., id. ¶¶ 15, 190, 210, 219.) Defendants do not contest these threshold elements. Instead, they focus on each count's substance. As to Counts I and II,

- 6 -

Defendants argue that Plaintiffs have failed to plausibly allege any fiduciary breach occurred. (Defs.' Br. (Doc. 12) at 15-31, 35-41.) As to Count III, Defendants argue that MassMutual's fee arrangement is statutorily exempted from ERISA's prohibited transaction provision. (Id. at 32-35.)

## A. Count I: Prudence, Monitoring, Loyalty, and Acting in Accordance with Plan Documents and Instruments

Count I alleges Defendants violated ERISA by breaching their fiduciary duties of (1) prudence, (2) monitoring, (3) loyalty, and (4) obligation to act in accordance with plan documents and instruments. (Compl. (Doc. 1) ¶¶ 188-208 (citing 29 U.S.C. § 1104(a)(1)(A)-(B), (D)).) These "fiduciary obligations of the trustees to the participants and beneficiaries of [an ERISA] plan are . . . the highest known to the law." Tatum v. RJR Pension Inv. Comm., 761 F.3d 346, 356 (4th Cir. 2014) (alterations in original) (internal quotation marks omitted) (quoting Donovan v. Bierwirth, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). Each fiduciary duty is addressed in turn.

### 1. Duty of Prudence

ERISA's duty of prudence requires that plan fiduciaries act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29

- 7 -

U.S.C. § 1104(a)(1)(B). "The primary question is whether the fiduciary, 'at the time [it] engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment'" or the merits of a third-party service provider's proposed fees and services. Reetz v. Lowe's Cos., Inc., Civil Action No. 5:18-CV-00075-KDB-DCK, 2021 WL 4771535, at *53 (W.D.N.C. Oct. 12, 2021) (alteration in original) (quoting DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 420 (4th Cir. 2007)).

In Count I, Plaintiffs allege Defendants imprudently failed to (1) limit MassMutual's fees, (2) offer funds utilizing the most affordable share classes, and (3) offer passive funds. (Compl. (Doc. 1) ¶¶ 191, 200.) Courts in this circuit have found similar factual allegations sufficiently alleged ERISA imprudence claims. See e.g., Jones v. Coca-Cola Consol., Inc., No. 3:20-cv-00654-FDW-DSC, 2021 WL 1226551, at *4 n.3 (W.D.N.C. Mar. 31, 2021) ("Alleging that excessively high fees were charged to plan participants can independently constitute a breach of one's dut[y] of prudence . . . under ERISA."); Kruger v. Novant Health, Inc., 131 F. Supp. 3d 470, 478 (M.D.N.C. 2015) ("[The] present [p]laintiffs have stated enough of a claim for breach of fiduciary duty to survive Defendants' motion to dismiss based on the imprudent retention of the retail class

- 8 -

funds when institutional class shares were available."); <u>Dearing v. IQVIA, Inc.</u>, No. 1:20CV574, 2021 WL 4291171, at *2 (M.D.N.C. Sept. 21, 2021) (declining to dismiss the plaintiffs' allegations that the "[d]efendants' decision to add the Active [fund] suite over the Index [fund] suite, and their failure to replace the Active suite with the Index suite at any point during the Class Period, constitute[d] a glaring breach of their fiduciary duties.").

### a. **Failure to Limit MassMutual's Fees**

Plaintiffs allege that MassMutual, the Plan's recordkeeper, "received handsome compensation, much higher than what Shoe Show could have easily negotiated, which ultimately the Plan's participants, including the class representatives, paid."[3] (Compl. (Doc. 1) ¶¶ 93, 96; <u>accord</u> <u>id.</u> ¶¶ 191(C), 191(E), 200(C).) MassMutual was compensated via a practice known as "revenue sharing," meaning it received "asset based compensation, not fixed dollar or per head pay." (<u>Id.</u> ¶¶ 59, 101.) Therefore, when the Plan's "assets grew, so did MassMutual's effective earnings even though its duties and accounting costs did not grow in proportion." (<u>Id.</u> ¶ 102.)

---

[3] Plaintiffs level similar overpayment allegations against LPL Financial (<u>Id.</u> ¶¶ 109–11.)

Plaintiffs argue that Defendants should have used "the Plan's increasing size and long-standing relationship [with MassMutual] as bargaining power to reduce the participants' recordkeeping fee." (Id. ¶ 104.) Specifically, Defendants "should have required MassMutual to charge a flat fee, such as $60 at the most, for each participant to reflect the actual cost of recordkeeping." (Id. ¶ 106.) Defendants discarding revenue sharing would be in accordance "with the consistent [industry] trend of not utilizing investment revenue to pay fees." (Id. ¶ 158(A) (internal quotation marks omitted) (quoting the Deloitte Defined Contribution Benchmarking Survey, 2019 edition)[4].) At a minimum, Plaintiffs argue Defendants should have hired a consultant to benchmark the Plan's administrative costs or "engaged in an objective, competitive process to hire the lowest cost" recordkeeper. (Id. ¶¶ 197-98.)

---

[4] Defendants argue that Plaintiffs' references to the Deloitte and NEPC publications are "inapposite" because the plans those publications studied were significantly larger, had higher participant account balances, and greater employee participation than the Plan here. (Defs.' Br. (Doc. 12) at 34 n.6.) Nevertheless, when adjudicating Defendants' Motion to Dismiss, this court must liberally construe "the [C]omplaint, including all reasonable inferences therefrom," in Plaintiffs' favor. Est. of Williams-Moore, 335 F. Supp. 2d at 646. Therefore, this court reserves judgment as to whether the publications' survey samples are too dissimilar from the Plan to serve as useful benchmarks.

"A plaintiff raising an excessive fee claim under ERISA must allege 'that fees were excessive related to the services rendered.'" Kendall v. Pharm. Prod. Dev., LLC, No. 7:20-CV-71-D, 2021 WL 1231415, at *11 (E.D.N.C. Mar. 31, 2021) (quoting Young v. Gen. Motors Inv. Mgmt. Corp., 325 F. App'x 31, 33 (2d Cir. 2009)). Moreover, a "plan fiduciary's failure to reduce recordkeeping costs through negotiation or the solicitation of competing bids may in some cases breach the duty of prudence." Id. at *10 (internal quotation marks omitted) (quoting Silva v. Evonik Corp., CV No. 20-2202, slip op. at 8 (D.N.J. Dec. 30, 2020) (unpublished)).

Plaintiffs have sufficiently and plausibly alleged that MassMutual's fees were excessive compared to the services it provided. (E.g., Compl. (Doc. 1) ¶¶ 94, 102 ("Defendants allowed excessive compensation to be paid to providers such as . . . MassMutual over the years" because when the Plan's "assets grew, so did MassMutual's effective earnings even though its duties and accounting costs did not grow in proportion.").) Likewise, Plaintiffs have sufficiently and plausibly alleged that Defendants failed to reduce recordkeeping costs via negotiation or solicitation of competing bids. (E.g., id. ¶¶ 93, 191(E) (Defendants never "negotiat[ed] with service providers to lower costs" or "put the Plan's recordkeeping contract up for bid to

- 11 -

cause MassMutual to competitively bid for Shoe Show's work.");
accord e.g., id. ¶ 198.)

Defendants argue that the Plan's asset pool was too small
to confer enough bargaining power for Defendants to renegotiate
MassMutual's revenue sharing fee arrangement. (Defs.' Br.
(Doc. 12) at 27-28.) They stress that the Plan's approximately
$40 million asset pool makes it of "relatively small size,"
compared to what is usually seen in ERISA cases. (Id. at 19, 28;
Defs.' Reply (Doc. 22) at 13-14 ("Shoe Show's Plan is only 3%
the size of Novant's plan, and less than 0.5% the size of Wal-
Mart's plan. Plaintiffs' implication that Shoe Show similarly
enjoys the bargaining leverage of a Novant or Wal-Mart is not a
'close call'—it is implausible on its face. Moreover, none of
the other cases cited in Plaintiffs' brief involved 401(k) plans
near as small as Shoe Show's Plan. The smallest plan at issue
was $500 million, still more than ten times larger than Shoe
Show's Plan." (internal citations omitted)).)

Defendants' argument raises factual questions and is thus
premature. While the Plan's asset pool may be significantly
smaller than those in other cases, at this preliminary juncture
it cannot be determined that—as a matter of law—a $40 million
asset pool fails to confer a plan with sufficient bargaining
power to renegotiate a recordkeeper's revenue sharing fee

- 12 -

structure. At the motion to dismiss stage, this court must accept the Complaint's factual allegations (not Defendants' allegations) as true. Iqbal, 556 U.S. at 678. The Complaint alleges that the Plan is "relatively large," bestowing upon Defendants significant "bargaining power to reduce the participants' recordkeeping fee." (Compl. (Doc. 1) ¶¶ 104, 106.) Given that these allegations must be taken as true, this court declines at this time to find that the Plan's asset pool was too small for Defendants to negotiate lower fees from MassMutual.

Defendants also argue that even if the Plan was large enough to allow MassMutual's fee arrangement to be renegotiated, the Plan would not have been better served by replacing revenue sharing with a flat fee per participant structure. (Defs.' Br. (Doc. 12) at 27.) Defendants insist that because Plaintiffs have failed to allege "that any fees not paid through revenue sharing would have been paid instead by Shoe Show," "abandoning revenue sharing would . . . [simply] redirect administrative costs to be borne by the Plan." (Id. at 25, 27.) This argument does not rebut Plaintiffs' imprudence claim. Insofar as that claim, Plaintiffs do not allege that forgoing revenue sharing would necessarily shift the fee burden to Defendants from participants or the Plan itself. Rather, Plaintiffs acknowledge that even if revenue sharing is replaced by direct fees, the Plan may still

- 13 -

be responsible for those fees. (Compl. (Doc. 1) ¶¶ 54-55 ("Fixed dollar or per head compensation occurs when a recordkeeper or custodian is paid a certain, set amount per participant . . . . [These] expenses can be paid . . . directly by the plan[.]").) Nonetheless, Plaintiffs still argue that revenue sharing should be discarded because they would ultimately be better served by a flat per participant direct fee structure. (Id. ¶¶ 106, 200(B).)

Plaintiffs allege that the Plan's current revenue sharing arrangement charges participants $219 in annual fees, a "windfall" for MassMutual given that the industry fee average is far lower. (Id. ¶¶ 97, 106.) Plaintiffs also assert that among plan fiduciaries there is a "consistent trend of not utilizing investment revenue to pay fees." (Id. ¶ 158(A) (internal quotation marks omitted) (quoting the Deloitte Defined Contribution Benchmarking Survey, 2019 edition); accord id. ¶ 57.) Given these allegations—which must be taken as true at this juncture, Iqbal, 556 U.S. at 678—Plaintiffs' claim that Defendants imprudently failed to require "MassMutual to charge a flat fee, such as $60 at the most, for each participant to reflect the actual cost of recordkeeping," (id. ¶ 106), passes "across the plausibility line, and the court allows [P]laintiffs' claim of imprudence regarding recordkeeping fees to proceed." Kendall, 2021 WL 1231415, at *10-11 (allowing an

- 14 -

ERISA excessive recordkeeping fee imprudence claim to proceed where a revenue sharing arrangement allegedly cost participants between $54 and $143 annually).

### b.    Failure to Offer Funds Utilizing the Most Affordable Share Classes

Plaintiffs allege that "Defendants continually imprudently limited their participants' choices to high-cost retail share classes of funds." (Compl. (Doc. 1) ¶ 115; accord id. ¶ 191(A).) Plaintiffs explain that "[t]he only difference between retail and institutional funds is that the institutional funds are less expensive to the participants." (Id. ¶ 114 (emphasis in original).) Plaintiffs maintain that Defendants "did not even ask MassMutual for institutional funds," even though MassMutual would be "willing, particularly given the size of the Plan, to offer institutional funds and even to waive minimum purchase amounts for institutional funds when asked." (Id. ¶ 118.)

While Plaintiffs acknowledge that in 2018 "Defendants replaced some share classes in the Plan with slightly less costly classes," Plaintiffs assert these new classes were still "not the lowest cost options"; rather, "they were also unnecessarily expensive and detrimental to the Plan's participants." (Id. ¶ 133.) Plaintiffs question why when Defendants replaced these share classes, they did not choose funds with even cheaper classes that the Plan qualified for.

- 15 -

(Id. ¶¶ 134-42.) Defendants' failure to "pick up the phone and call MassMutual and demand the exact same fund with a lower cost structure" "caused inferior performance for the Plan . . . as well as the participants en masse." (Id. ¶ 143.)

In Tibble v. Edison International, 575 U.S. 523 (2015), the plaintiffs made similar allegations to Plaintiffs here. The Tibble plaintiffs alleged that their plan fiduciaries had offered "higher priced retail-class mutual funds as Plan investments when materially identical lower priced institutional-class mutual funds were available." Id. at 525-26. In remanding the case for further findings, the Supreme Court held that the plaintiffs had identified a potential violation with respect to these funds because "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." Id. at 530. But importantly, "'merely alleging that a plan offered retail rather than institutional share classes is insufficient to carry a claim for fiduciary breach.' In analyzing alleged lower cost alternatives, a court should consider 'whether the [more expensive] class share offered other benefits that may have offset any additional costs.'" Kendall, 2021 WL 1231415, at *7 (internal citations omitted) (quoting Marks v. Trader Joe's Co., No. CV19-10942 PA (JEMx), 2020 WL 2504333, at *8 (C.D. Cal.

- 16 -

Apr. 24, 2020)). If there are no other benefits, but instead the lower cost alternatives are identical, then a plausible breach of a plan fiduciary's duty of prudence has been alleged. <u>Jones</u>, 2021 WL 1226551, at *5 ("Plaintiffs' factual allegations regarding Defendants' alleged failure to utilize cheaper investments that offer identical underlying investments [such as cheaper share classes] sufficiently states a claim for breach of fiduciary duty.").

Here, Plaintiffs have alleged sufficient facts that Defendants breached their duty of prudence by offering funds featuring overly expensive retail share classes. Plaintiffs have alleged that Defendants offered funds with share classes that are composed of "the exact same" underlying investments as funds with "lower cost structure[s]." (Compl. (Doc. 1) ¶ 143.) These allegations plausibly suggest that Defendants have failed to properly monitor the Plan's investments and remove imprudent funds. <u>Tibble</u>, 575 U.S. at 528. Defendants have not provided any credible explanation justifying the more expensive share classes. Defendants argue that the Plan's more expensive retail share classes are "meaningfully different" from the less expensive classes because the cheaper "institutional share classes do <u>not</u> enable Plan administrative expenses to be paid through revenue sharing." (Defs.' Br. (Doc. 12) at 20-21

- 17 -

(emphasis in original).) But, per Plaintiffs' allegations, revenue sharing is not a benefit—it is a detriment, see supra Part IV.A.1.a, and at the motion to dismiss stage Plaintiff's allegations are assumed to be true. Defendants also maintain that the Plan was too small "to negotiate for less expensive institutional share classes." (Defs.' Br. (Doc. 12) at 20.) This argument fails for the same reason it failed regarding Defendants' ability to negotiate lower recordkeeping fees. See supra Part IV.A.1.a. It raises a factual dispute that at this juncture must be decided in favor of Plaintiffs' averments to the contrary. Therefore, Plaintiffs plausible allegations that Defendants selected unnecessarily expensive share classes for the Plan suffice to state an imprudence claim.

### c. Failure to Offer Passively Managed Funds

Plaintiffs allege that "Defendants had the option and ability to obtain passive . . . funds [also known as index funds], which would be unequivocally better for the participants, but they failed to do so." (Id. ¶ 129; accord id. ¶¶ 79, 191(B).) Instead, "Defendants only offer[ed] actively managed funds in the plan," (id. ¶ 124), which "are typically much more expensive than index funds," (id. ¶ 81). Plaintiffs question whether this added expense is worthwhile, using one of the Plan's underperforming active funds to support the

- 18 -

proposition that "80% or more of active managers across all categories underperformed their respective benchmarks." (Id. ¶¶ 80, 151 (internal quotation marks omitted) (quoting S&P Dow Jones Scorecard).) Given this persistent underperformance, Plaintiffs allege that plan fiduciaries are increasingly turning to index funds. (Id. ¶ 159(C).)

While this court and others in this circuit have allowed imprudence allegations based on the use of active rather than passive funds to survive motions to dismiss, to do so a plaintiff must identify passive funds that can serve as a meaningful benchmark to a plan's active funds. See e.g., Dearing, 2021 WL 4291171, at *2 (alleging that the passive funds the defendants should have selected and the active funds the defendants had selected were "similar in many ways—they [we]re offered by the same investment management company, they share[d] a management team, and appear[ed] to have near identical asset allocation strategies"); Kendall, 2021 WL 1231415, at *9 (holding that if "actively-and passively-managed funds can be compared, [a] complaint . . . [must] contain a meaningful benchmark").

Here, Plaintiffs have failed to identify a meaningful benchmark that could support the Complaint's conclusory allegations. They simply broadly assert that replacing the

- 19 -

Plan's costly active funds with cheaper passive funds would be
"unequivocally better" for plan participants, (Compl. (Doc. 1)
¶ 128), but Plaintiffs never specify exactly which particular
passive funds should be added or why those funds can serve as
meaningful benchmarks to the Plan's active funds. In lieu of
such allegations, Plaintiffs have failed to plead sufficient
facts to plausibly allege Defendants' failure to offer passive
funds was imprudent.

### 2. Duty to Monitor

"A claim for the failure to monitor derives from and
depends on an 'underlying breach of fiduciary duty cognizable
under ERISA.'" Kendall, 2021 WL 1231415, at *11 (quoting In re
Duke Energy ERISA Litig., 281 F. Supp. 2d 786, 795 (W.D.N.C.
2003)). Thus, the "duty to monitor claim is only as broad as the
surviving prudence claim and is otherwise dismissed." Id. at *12
(internal quotation marks omitted) (quoting Cunningham v.
Cornell Univ., No. 16-cv-6525 (PKC), 2017 WL 4358769, at *11
(S.D.N.Y. Sept. 29, 2017)). Because this court has found
Plaintiffs' excessive fee and share class allegations state
plausible imprudence claims, supra Parts IV.A.1.a-b, Plaintiffs'
monitoring claim survives as well. The duty to monitor requires
that plan fiduciaries "'systematic[ally] conside[r] all the
investments . . . at regular intervals' to ensure that they are

appropriate." Tibble, 575 U.S. at 529 (quoting A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees § 684, at 145–46 (3d ed. 2009)). In short, "a fiduciary is required to conduct a regular review of its investment." Id. at 528.

Plaintiffs allege Defendants breached this duty "to monitor and control investment and administrative costs on an ongoing basis" because Defendants failed to take steps "such as hiring a consultant to conduct a benchmarking study" and "conduct[ing] a prudent and objective review of the Plan's investments." (Compl. (Doc. 1) ¶¶ 200(E), 204.) Defendants respond that this alleged failure to monitor is contradicted by the Plan's Form 5500 filings and Plaintiffs' own allegations, which show that Defendants periodically changed the Plan's funds—evincing adequate monitoring. (Defs.' Br. (Doc. 12) at 30-31.) But Plaintiffs' factual allegations about these changes cast them in a different light. Plaintiffs argue that it was not until 2018 that Defendants replaced several expensive share classes with cheaper identical classes, suggesting that Defendants must not have been "monitor[ing] the fee structures of the Plan until that time." (Compl. (Doc. 1) ¶ 152.) Thus, for the first four years of the class period, (id. ¶ 9), Defendants allegedly failed to monitor the Plan. Because when adjudicating motions to dismiss this court makes "all reasonable inferences . . . in the

plaintiff's favor," Est. of Williams-Moore, 335 F. Supp. 2d at 646, this court must defer to Plaintiffs' description of the 2018 Plan changes. Therefore, Plaintiffs have alleged sufficient facts to state a plausible monitoring claim.

### 3. Duty of Loyalty

ERISA's duty of loyalty requires that a plan fiduciary "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). "To state a claim for breach of the duty of loyalty, plaintiffs must plausibly allege that the [defendants] acted with the purpose of benefitting itself or a third party." Kendall, 2021 WL 1231415, at *11. These allegations "must do more than simply recast purported breaches of the duty of prudence as disloyal acts." Id. (internal quotation marks omitted) (quoting Sacerdote v. N.Y. Univ., No. 16-cv-6284 (KBF), 2017 WL 3701482, at *5 (S.D.N.Y. Aug. 25, 2017)) ("Specifically, prudence claims regarding recordkeeping may not simply be repackaged as a disloyalty claim without additional allegations."). Rather, disloyalty allegations must "must contain independent facts 'suggesting [that] Defendant benefitted, financially or

- 22 -

otherwise, from any decisions related to the Plan[] or engaged in disloyal conduct in order to benefit itself or someone other than the Plan['s] beneficiaries.'" Id. (alterations in original) (quoting Nicolas v. Trs. of Princeton Univ., No. 17-3695, 2017 WL 4455897, at *3 (D.N.J. Sept. 25, 2017)).

Plaintiffs allege Defendants breached their duty of loyalty by "[f]ailing to act 'solely and exclusively' for the benefit of participants by selecting and retaining investments in the Plan . . . because they would generate more revenue for MassMutual and therefore, the Defendants would not receive an invoice for recordkeeping." (Compl. (Doc. 1) ¶ 200(A).) Plaintiffs assert Defendants' desire to relieve pressure off themselves to pay MassMutual's fees was Defendants' motivation in selecting the Plan's higher price active funds and share classes. (Id. ¶ 127.)

This is rank speculation and does not raise more than a "sheer possibility," Iqbal, 556 U.S. at 678, that Defendants actually had these disloyal motivations, see, e.g., Brotherston v. Putman Invests., LLC, 907 F.3d 17, 40-41 (1st Cir. 2018) (To establish disloyalty it must be shown that a "fiduciary's operative motive was to further its own interests." (internal quotation marks omitted) (quoting Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 6 (1st Cir. 2018))). Plaintiffs have failed to provide any "independent facts" or "additional allegations,"

Kendall, 2021 WL 1231415, at *11, to support the disloyalty claim and distinguish it from the imprudence claim. Instead, Plaintiffs "simply recast," id., the facts underlying the imprudence claim—namely, that Defendants offered unnecessarily expensive active funds and share classes—and speculate that these facts make it "possible" Defendants "potentially had an incentive" to "push costs to its workers" to "relieve[] pressure on the recordkeeper to charge Shoe Show fees directly." (Compl. (Doc. 1) ¶¶ 120-21, 127.) These allegations concerning Defendants' "possible" and "potential" motives, (id. ¶¶ 120, 127), do not rise to the level of plausibility necessary to state a disloyalty claim.

Further undermining the disloyalty claim is that Plaintiffs never allege Defendants would have necessarily paid any increased fees that MassMutual would have demanded if the Plan transitioned to cheaper share classes or passive funds. Contra Kruger, 131 F. Supp. 3d at 479 n.9 (The plaintiffs alleged the defendants "repeatedly represented that the administrative costs of the Plan would not be paid by the Plan itself," thus indicating that the defendants would pay any increased fees imposed by the recordkeeper.). Instead, it seems just as likely—perhaps more so—that Defendants would push those new fees back on participants by having the Plan pick up the increased tab.

- 24 -

Plaintiffs expressly acknowledge that this is an option by explaining that ERISA plan administrative expenses do not have to be either "paid directly by employers" or paid via "revenue sharing," but rather can also be paid "directly by the plan." (Compl. (Doc. 1) ¶ 55.) Consequently, there is no reason to believe that in this case Defendants were selecting more expensive funds to relieve pressure off themselves to have to pay MassMutual's fees. Even if Defendants had selected cheaper funds and as a result MassMutual demanded greater fees to make up for the lost revenue, the Complaint fails to plausibly allege that those new fees would be shouldered by Defendants as opposed to the Plan itself. Therefore, Plaintiffs have failed to plead sufficient facts to state a plausible disloyalty claim, and the portions of Count I that attempt to assert such a claim will be dismissed.

### 4. Duty to Act in Accordance with Plan Documents and Instruments

ERISA requires that plan fiduciaries act "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). "ERISA's 'statutory scheme . . . is built around reliance on the face of written plan documents,'" Jordan v. MEBA Pension Tr., No. ELH-20-3649, 2021 WL 4148460, at *9 (D. Md. Sept. 10, 2021) (alteration in original) (quoting U.S. Airways, Inc. v. McCutchen, 569 U.S. 88, 100 (2013)), and

- 25 -

thus plan fiduciaries must administer the Plan in accordance with the "literal and natural meaning" of Plan documents' "plain language," United McGill Corp. v. Stinnett, 154 F.3d 168, 172 (4th Cir. 1998) (internal quotation marks omitted) (quoting Health Cost Controls v. Isbell, 139 F.3d 1070, 1072 (6th Cir. 1997)).

Plaintiffs insist that "Defendants violated their own plan documents" by failing to adhere to "MassMutual's investment policy." (Compl. (Doc. 1) ¶ 148; accord id. ¶¶ 149, 168-69, 204.) Plaintiffs' Complaint, after alleging that the Plan's investment options were too expensive and insufficiently diversified, recites MassMutual's investment policy and then declares—in rather conclusory fashion—that "Defendants' actions did not meet this policy." (Id. ¶ 169.) Thus, "Defendants violated . . . [t]he ERISA statute [which] requires fiduciaries to act 'in accordance with the documents and instruments governing the plan.'" (Id. ¶ 149 (quoting 29 U.S.C. § 1104(a)(1)(D)).)

These allegations amount to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Iqbal, 556 U.S. at 678. Moreover, it appears that MassMutual's investment policy, which Defendants have allegedly violated, is simply a "recommended" policy. (Compl. (Doc. 1)

¶ 168.) Indeed, the policy uses non-binding language. (Id. ¶ 169 ("The policy states: 'The Plan intends to provide . . . . Major asset classes to be offered may include . . . .'") (emphases added); id. ¶ 148(A) ("The particular investments should pursue the following standards . . . .") (emphasis added).)

However, this court remains mindful

> of the practical context of ERISA litigation. No matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences. Thus, while a plaintiff must offer sufficient factual allegations to show that he or she is not merely engaged in a fishing expedition or strike suit, [courts] must also take account of their limited access to crucial information. If plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer. These considerations counsel careful and holistic evaluation of an ERISA complaint's factual allegations before concluding that they do not support a plausible inference that the plaintiff is entitled to relief.

Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 598 (8th Cir. 2009); accord Reetz v. Lowe's Cos., Inc., Civil Action No. 5:18-CV-00075-KDB-DCK, 2019 WL 4233616, at *3 (W.D.N.C. Sept. 6, 2019). Plaintiffs' failure to sufficiently state a plausible claim for failure to act in accordance with plan documents and instruments may possibly be a result of this "limited access to crucial information . . . which tend[s] systemically to be in the sole possession of defendants." Braden, 588 F.3d at 598.

- 27 -

Plaintiffs seem to admit as much; they state that "[o]nce Plaintiffs obtain the Plan's Adoption Agreement," and other Plan documents, "a more formal and precise list of . . . breaches can be asserted." (Compl. (Doc. 1) ¶ 202.)

Nevertheless, despite ERISA litigation's inherent information asymmetries, pursuant to Iqbal, 556 U.S. at 678, this court simply cannot allow this "threadbare" and "conclusory" claim to proceed. Dismissal of Plaintiffs' failure to act in accordance with plan documents and instruments claim is especially warranted given that the Complaint itself acknowledges that the Plan document Defendants allegedly violated, and the terms contained therein, were non-binding. (See Compl. (Doc. 1) ¶¶ 148(A), 168.) Therefore, Plaintiffs have not pled sufficient facts to state a plausible failure to act in accordance with plan documents and instruments claim, and the portions of Count I that attempt to assert such a claim will be dismissed.

## B.   __Count II: Diversification__

Count II alleges that Defendants imprudently failed to diversify the Plan's funds.[5] (Id. ¶¶ 209-17.) ERISA requires that plan fiduciaries "diversify[] the investments of the plan so as to minimize the risk of large losses." 29 U.S.C. § 1104(a)(1)(C). A failure to diversify can lead to excessive correlation between the plan's funds, causing funds that "are in the same sector . . . to rise and fall together." Stegemann v. Gannett Co., 970 F.3d 465, 478 (4th Cir. 2020). "[T]he essence of diversification is that a diversified portfolio is superior to a non-diversified portfolio because a diversified portfolio can achieve the same expected return as an un-diversified portfolio, but the diversified portfolio will be less risky." Id. at 481.

Plaintiffs allege that the portfolio of funds "Defendants selected provided little diversification among the equity funds." (Compl. (Doc. 1) ¶ 167.) For example, the Plan "lacked a

---

[5] Count II advances both an ERISA imprudence claim and an ERISA diversification claim. (Compl. (Doc. 1) at 59 ("COUNT II VIOLATION OF ERISA §§ 404(a)(1)(B) and (C) BREACH OF DUTIES OF PRUDENCE AND DIVERSIFICATION").) ERISA's structure intertwines these claims. Stegemann, 970 F.3d at 473 n.7 ("Between § 1104(a)(1)(B) and § 1104(a)(1)(C), ERISA has a somewhat circular structure. Prudence includes diversification, and diversification references prudence."). Given this "overlap," id., this court's analysis of Count II appropriately applies to both claims.

basic emerging market fund or real estate fund . . . that would
have greatly helped participants diversify." (Id. ¶ 214.)
Defendants insist this lack of diversity led to high levels of
correlation between the Plan's equity funds, (id. ¶ 166),
leaving participants "unable to maintain a good portfolio," (id.
¶ 215).

Plaintiffs have failed to plead sufficient facts to state a
plausible diversification claim. That the Plan lacked certain
sector-specific funds, such as an emerging market or real estate
fund, (id. ¶ 214), does not render the Plan undiversified
because ERISA "does not demand that plans offer . . . any []
particular type of investment." Reetz, 2021 WL 4771535, at *51.
Plaintiffs themselves acknowledge "that 'the Plan has offered
over twenty investment options,'" (Pls.' Br. (Doc. 20) at 35-36
(quoting Defs.' Br. (Doc. 12) at 12)), and do not contest that
the Plan's Form 5500s show this includes

> (1) a suite of lifestyle funds, each of which is "one-
> stop shopping" to invest in a diversified mix of
> underlying funds with exposure to bonds and equity in
> a range of geographies, sectors, and market
> capitalizations; (2) a balanced fund, which invests
> roughly 60/40 in equities and bonds; (3) a suite of
> target-date funds, each of which is a "set it and
> forget it" dynamic portfolio of diversified
> investments in underlying bond and equity funds in a
> variety of geographies, sectors, and market
> capitalizations, the allocation of which becomes more
> conservative over time through retirement; (4) an
> array of funds allowing for non-U.S. geographic
> investment diversity, including developing and

> emerging markets; (5) an array of funds allowing for
> diversity based on market capitalization, including
> small- and mid-cap and large-cap options; and (6) a
> variety of funds offering diversified cash and cash
> equivalency exposures, including diversified bond
> funds and a stable value fund.

(Defs.' Br. (Doc. 12) at 38-39 (citing the Plan's Form 5500s, Exs. A–F (Docs. 12-1 – 12-6)).) Thus, Plaintiffs' insistence that the Plan was undiversified, among equity funds or otherwise, is a bare allegation made implausible by uncontroverted public records.

Finally, there is no legal basis for Plaintiffs' allegation that Defendants breached their duty to diversify by offering equity funds that were too correlated. In this circuit, the correlation theory of diversification has been applied only to plans offering multiple funds that are solely invested in a single company's stock. Stegemann, 970 F.3d at 478; Tatum, 855 F.3d at 566-67. Because the Plan here did not contain any of these so-called "single-stock" funds, there is no legal precedent for finding its equity funds too correlated—even taking as true Plaintiffs' allegations that "Defendants' equity (stock) fund[s]" feature a ">90% correlation." (Compl. (Doc. 1) ¶ 166.) Therefore, Count II will be dismissed because it lacks sufficient facts to state a plausible diversification claim.

C.  **Count III: Prohibited Transactions**

ERISA prohibits plan fiduciaries from entering transactions with a "party in interest," which includes "a person providing services to such plan." 29 U.S.C. §§ 1002(14)(B), 1106(a). Specifically, the statute requires that

> (1)  A fiduciary with respect to a plan shall not
>       cause the plan to engage in a transaction, if he
>       knows or should know that such transaction
>       constitutes a direct or indirect—
>
>       . . . .
>
> (C)  furnishing of . . . services . . . between
>       the plan and a party in interest;
>
> (D)  transfer to, or use by or for the benefit of
>       a party in interest, of any assets of the
>       plan.

Id. § 1106(a)(1). These prohibitions "supplement[] the fiduciary's general duty of loyalty to the plan's beneficiaries by categorically barring certain transactions deemed 'likely to injure the pension plan.'" Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 241-42 (2000) (internal citation omitted) (quoting Comm'r v. Keystone Consol. Indus., Inc., 508 U.S. 152, 160 (1993)). Importantly, however, a plan fiduciary may prove a given transaction with a party in interest is exempted from these prohibitions if it raises the affirmative defense that the transaction was "necessary for the . . . operation of the plan," and "no more than reasonable

- 32 -

compensation [wa]s paid therefor." 29 U.S.C. § 1108(b)(2)(A);
see also Sims v. BB&T Corp., No. 1:15-CV-732, 2018 WL 3128996,
at *11 (M.D.N.C. June 26, 2018) ("The defendants bear the burden
of establishing an exemption to a prohibited transaction.");
Braden, 588 F.3d at 600-01 (finding burden on the defendants to
establish "reasonable compensation" exemption to a prohibited
transaction claim).

Plaintiffs allege that the Plan's revenue sharing with
MassMutual constituted a prohibited transaction with a party in
interest. (Compl. (Doc. 1) ¶¶ 105, 219, 223.) Plaintiffs assert
that the revenue sharing fees "not only were not 'necessary for
operation of the Plan'" but also featured "excessive
compensation constitut[ing] a direct or indirect furnishing of
services between the Plan and a party in interest for more than
reasonable compensation and a transfer of assets of the Plan to
a party in interest." (Id. ¶ 222.)

Defendants do not contest that MassMutual is a party in
interest or that the revenue sharing arrangement falls within
the definition of a prohibited transaction; rather, Defendants
argue that the revenue sharing fees are exempted from ERISA's
prohibited transaction provisions because "Plaintiffs have not
plausibly alleged that the compensation to services providers is

'more than reasonable.'" (Defs.' Br. (Doc. 12) at 33 (citing 29 U.S.C. § 1108(b)(2)).)

This argument fails. As a preliminary matter, Plaintiffs have plausibly alleged that MassMutual's fees are more than reasonable. See supra Part IV.A.1.a. But such allegations are not necessary for Plaintiffs to state a prohibited transaction claim. All that is required are allegations that Defendants caused the Plan to enter a transaction with a party in interest. 29 U.S.C. § 1106(a)(1); see Braden, 588 F.3d at 600-02 (In stating a prohibited transaction claim, a plaintiff "does not bear the burden of pleading facts showing that the revenue sharing payments were unreasonable in proportion to the services rendered."). The alleged prohibited transaction's amount only becomes relevant when a defendant asserts the statutory "reasonable compensation" exemption, an affirmative defense. See Braden, 588 F.3d at 600-02 ("The statutory exemptions established by § 1108 are defenses which must be proven by the defendant."); Sims, 2018 WL 3128996, at *11 ("The defendants bear the burden of establishing an exemption to a prohibited transaction.").

This holds true even when, as here, a plaintiff's allegations explicitly address the reasonableness of the amount of the allegedly prohibited transaction. Braden, 588 F.3d at 601

- 34 -

n.10 (The defendants argued that the plaintiff's "allegations 'put the [reasonable compensation] exemption in play' and he therefore must plead sufficient facts to show that the payments were unreasonable. To the contrary, a plaintiff need not plead facts responsive to an affirmative defense before it is raised."). Pursuant to Federal Rule of Civil Procedure 12(b), only certain defenses—not including the reasonable compensation exemption to an ERISA prohibited transaction claim—can be asserted in a motion. All other defenses may only be asserted in responsive pleadings. Fed. R. Civ. P. 12(b). This court is presently adjudicating Defendants' Motion to Dismiss, and thus the case has yet to progress to the responsive pleading stage. Consequently, as a matter of law, it is premature for Defendants to assert the reasonable compensation affirmative defense. Therefore, this court finds that Plaintiffs have sufficiently stated a plausible prohibited transaction claim.

V.    **CONCLUSION**

For the foregoing reasons, this court finds that Defendants' Motion to Dismiss Plaintiffs' Complaint, (Doc. 11), should be granted in part and denied in part.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss Plaintiffs' Complaint, (Doc. 11), is **GRANTED IN PART** and **DENIED IN PART**.

Defendants' Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART** as to Count I. The Motion to Dismiss is **GRANTED** as to the portions of Count I that assert an imprudence claim based on a failure to offer passively managed funds, a disloyalty claim, and failure to act in accordance with plan documents and instruments claim. The remainder of the claims contained in Count I—an imprudence claim based on a failure to limit MassMutual's fees, an imprudence claim based on a failure to offer funds utilizing the most affordable share classes, and a duty to monitor claim— are not dismissed, and Defendants' Motion to Dismiss is **DENIED** as to those claims.

Defendants' Motion to Dismiss is **GRANTED IN FULL** as to Count II.

Defendants' Motion to Dismiss is **DENIED IN FULL** as to Count III.

**IT IS FURTHER ORDERED** that briefing on Plaintiffs' Motion for Class Certification and Appointment of Fitzgerald Law as Class Counsel, (Doc. 16), shall proceed. The parties are hereby instructed to propose a briefing schedule in their Federal Rule of Civil Procedure 26(f) report to this court.

This the 25th day of February, 2022.

_____
United States District Judge

- 36 -